

FILED

JUL 10 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF
# CALIFORNIA
# BAKERSFIELD

MYUNG JIN MYRA KOZLOWSKI,

     Plaintiff,

Case No. 1:18-cv-00131-DAD-EPG

-v-

BANK OF AMERICA, N.A.;
EQUIFAX, INC.; EQUIFAX
INFORMATION SERVICES, LLC.;
EXPERIAN INFORMATION SOLUTIONS, INC.;
TRANSUNION, LLC; THE MOORE LAW GROUP, APC;
HARVEY M. MOORE In his individual capacity;
and Does 1-10,

     Defendants.

## SECOND AMENDED COMPLAINT

## I. INTRODUCTION

1. This action arises out of Defendant Bank of America, N.A.'s (hereinafter "BANA")

violations of the Fair Credit Reporting Act 15 U.S.C. §1681 (hereinafter "FCRA"),

which prohibits reporters from engaging in deceptive and unfair practices. Defendant

BANA is a "furnisher of information" under the FCRA. Defendant reported derogatory remarks to the Credit Reporting Agencies (hereinafter "CRA").

2. This action arises out of Defendants EXPERIAN INFORMATION SOLUTIONS, INC (hereinafter "EXPERIAN"), and TRANSUNION, LLC's (hereinafter "TRANS"), consumer reporting agencies, as defined in the FCRA 15 U.S.C. §1681a(f), for violations of the FCRA, which requires them to send a manual or automated consumer dispute verification (ACDV) to the credit grantor identifying the disputed item, listing the basis of the dispute, and asking the credit grantor to verify the accuracy of the information reported. These Defendants, in making a report, failed to comply with this statute by failing to send to the Plaintiff a report that adequately explained the outcome of the investigation, in violation of 15 U.S.C. §1681i(a)(6).

3. This action arises out of Defendants EXPERIAN and TRANS's, consumer reporting agencies, as defined in the FCRA 15 U.S.C. §1681a(f), for violations of the FCRA, which requires them to adopt and follow "reasonable procedures" to assure the maximum possible accuracy of Plaintiff's consumer credit and other personal information which they complied, used and manipulated, in order to prepare consumer reports, credit scores, risk factor/denial codes and other economic and prediction data evaluations. *Guimond V. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) These Defendants have failed to comply with 15 U.S.C. §1681e(b).

4. As an additional breach of contract, this action is brought against EQUIFAX, INC. and EQUIFAX INFORMATON SERVICES, LLC (hereinafter collectively EQUIFAX) for its failures to protect and secure Plaintiff's personal identifying information ("PII"),

including full name, social security number, date of birth, address and some driver's license numbers of Plaintiff and some 143 million similarly situated consumers in the United States.

5. This action arises out of Defendants LAWFIRM and MOORE's violations for the Fair Credit Reporting Act 15 U.S.C. §1681b, which prohibits impermissible purposes for pulling consumer credit reports. On at 8 separate occasions, Defendants LAWFIRM and MOORE impermissibly pulled Plaintiff's credit report. Plaintiff seeks damages and other relief.

6. This action arises out of Defendants' THE MOORE LAW GROUP, APC (hereinafter "LAWFIRM") and HARVEY M. MOORE (hereinafter "MOORE") violations of the Fair Debt Collection Practices Act 15 U.S.C. §1692, et seq. ("FDCPA"), and the California Fair Debt Collection Practices Act, Title 1.6C ("CFDCPA") (Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §1788-1788.3) which prohibits collectors from engaging in deceptive and unfair practices. Plaintiff seeks damages and other relief. Collectively referred to as FDCPA.

7. Plaintiff brings forth this Amended Complaint as authorized by this Court on June 21, 2018 (ECF 47).

8. The Court "must construe [Plaintiff's] complaint liberally because [she] is proceeding pro se." *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 32 (3d Cir.2011) (citing *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)).

## PRELIMINARY STATEMENT - FDCPA

9. The FDCPA is a strict liability statute, which provides for actual or statutory damages upon the showing of <u>one</u> violation. The Ninth Circuit has held that whether a debt collector's conduct violates the FDCPA should be judged from the standpoint of the "least sophisticated" consumer. *Baker v. G.C. Services Corp.*, 677 F.2d 775, 778 (9th Cir. 1982); *Swanson v. Southern Oregon Credit Services, Inc.*, 869 F.2d 1222, 1227 (9th Cir. 1988). This objective standard "ensure[s] that the FDCPA protects all consumers, the gullible as well as the shrewd...the ignorant, the unthinking and the credulous." *Clomon v. Jackson*, 988 F.2d 1314, 1318-19 (2nd Cir. 1993). The FDCPA is a remedial statute. The remedial nature of the FDCPA requires that Courts interpret it liberally. *Clark v. Capital Credit & Collections Services, Inc.,* 460 F.3d 1162, 1176 (9th Cir. 2006).

10. 15 U.S.C. §1692k(a)(1) and (a)(2)(A) state that "...any debt collector who fails to comply with any provision of this title with respect to any person is liable to such person in an amount equal to the sum of any actual damage sustained by such person as a result of such failure; in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000."

## PRELIMINARY STATEMENT - FCRA

11. The FCRA regulates credit reporting agencies as well as creditors, <u>collection agencies</u>, and other parties who provide information to credit reporting agencies and/or <u>obtain</u> and use the consumer credit reports. 15 U.S.C. §1681b identifies the

permissible purposes allowed under the Act for conducting credit reviews on consumers.

12. 15 U.S.C. §1681n and §1681o, create a private right of action for consumers to bring against violators of any provision of the FCRA with regard to their credit. *Gorman v. Walpoff & Abramson*, 584 F.3d 1147, 1154 (9th Cir. 2009) In *DiMezza v. First USA Bank, Inc.*, 103 F.Supp.2d 1296, 1300 (D.N.M. 2000) the Court confirmed that "...the plain language of [15 U.S.C. §1681n and §1681o] provide a private right of action for a consumer against furnishers of information who have wilfully or negligently fail to perform their duties upon notice of a dispute...there is a private right of action for consumers to enforce the investigation and reporting duties imposed on furnishers of information." *Id.* 1300

13. 15 U.S.C. §1681a (8)(E) states in relevant part:

**(E)Duty of person after receiving notice of dispute** After receiving a notice of dispute from a consumer pursuant to subparagraph (D), the person that provided the information in dispute to a consumer reporting agency shall—

(i)

conduct an investigation with respect to the disputed information;

(ii)

review all relevant information provided by the consumer with the notice;

(iii)

complete such person's investigation of the dispute and report the results of the investigation to the consumer before the expiration of the period under section 1681i(a)(1) of this title within which a consumer reporting agency would be required to complete its action if the consumer had elected to dispute the information under that section; and

(iv)

if the investigation finds that the information reported was inaccurate, promptly notify each consumer reporting agency to which the person furnished the inaccurate information of that determination and provide to the agency any

correction to that information that is necessary to make the information provided by the person accurate.

14. A consumer has a private right of action to claim violations under 15 U.S.C. 1681s-2(b) when alleging that she contacted a CRA to notify them of the dispute, the CRA determined the claim was viable, the CRA contacted the furnisher of the inaccurate credit report, and that the furnisher failed to take remedial measures outlined in the statute. The CRAs contacted BANA (furnisher), and BANA failed to take remedial measures.

## II. JURISDICTION

1. Jurisdiction arises under 15 U.S.C. §1681 et seq., 15 U.S.C. §1692k, Cal. Civ. Code §1788-1788.3, 28 U.S.C. §1331, and 28 U.S.C. §1337(a). Violations have occurred within one (1) year prior to the filing of this original case.

2. Personal jurisdiction exists over Defendants as they had the necessary minimum contacts in this State and this suit arises out of their specific conduct with Plaintiff.

## III. VENUE

3. Venue is established as Defendants do business in this district, reside in this district and have the capacity to be sued in its common name. See 28 U.S.C. §1391(a).

## IV. PARTIES

4. Plaintiff Myung Jin Myra Kozlowski (hereinafter "Plaintiff") is a consumer whose address is 3816 Vista De Lago Ct, Bakersfield, CA 93311.

5. Plaintiff is a consumer as defined by 15 U.S.C. §1692a(3), and is a "person" as defined by 15 U.S.C. §1681a(b).

6. Defendant BANA is a federally chartered bank with its principal place of business located at 100 N. Tyron St, Charlotte, NC 28255. Defendant BANA is a furnisher of information within the meaning of the FCRA, 15 U.S.C. §1681s-2(b).

7. Defendant EQUIFAX, INC (hereinafter "EQUIFAX"), is a Delaware foreign corporation believed to be authorized to do and is doing business in the State of California. Defendant EQUIFAX is a "consumer reporting agency," as codified at 15 U.S.C. §1681a(e). Defendant EQUIFAX principal place of business is located at 1550 Peachtree Street, N.W., Atlanta, GA 30309. EQUIFAX LLC may be served through its registered agent, Corporation Services Company, 211 E. 7th St., Suite 620, Austin, TX 78701. EQUIFAX is a public corporation, trading in the New York Stock Exchange as "EFX". EQUIFAX is the parent corporation of EQUIFAX, LLC.

8. Defendant EQUIFAX INFORMATION SERVICES, LLC (hereinafter "EQUIFAX LLC") is a foreign corporation/limited liability company believed to be authorized to do and is doing business in the State of California. Defendant EQUIFAX LLC is a "consumer reporting agency," as codified at 15 U.S.C. §1681a(e). Defendant EQUIFAX LLC principal place of business is located at 1550 Peachtree Street, N.W., Atlanta, GA 30309. EQUIFAX LLC may be served through its registered agent, Corporation Services Company, 211 E. 7th St., Suite 620, Austin, TX 78701. EQUIFAX LLC is a provider of consumer credit reports and credit monitoring programs; business of "assembling or evaluating consumer credit information." 15 U.S.C. § 1681a(f).

9. Defendant EXPERIAN INFORMATION SOLUTIONS, INC., (hereinafter "EXPERIAN") is an Ohio Corporation with its principal place of business located at

475 Anton Boulevard, Costa Mesa, CA 92626. EXPERIAN is a provider of consumer credit reports and credit monitoring programs. Defendant EXPERIAN is a "consumer reporting agency," as codified at 15 U.S.C. §1681a(e).

10.     Defendant TRANSUNION, LLC (hereinafter "TRANS") is a Delaware Limited Liability Company, with its principal place of business at 555 W. Adams St., 6th Fl., Chicago, IL 60661. Defendant TRANS is a "consumer reporting agency," as codified at 15 U.S.C. §1681a(e). TRANS is a provider of consumer credit reports and credit monitoring programs; business of "assembling or evaluating consumer credit information." 15 U.S.C. § 1681a(f).

11.     Defendant LAWFIRM is a law firm engaged in the regular business of collecting debts due or alleged to be due to others, authorized to do business in California, as defined by 15 U.S.C. §1692a(5). Defendant LAWFIRM has its principal place of business at 3710 S. Susan St, Suite 210, Santa Ana, CA 92704. Defendant LAWFIRM is a debt collector as defined by 15 U.S.C. §1692a(6) and 15 U.S.C. §1681a(b). At all relevant times was engaged, by use of the mails, in attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

12.     Upon information and belief Defendant, MOORE is a natural person and is a resident of the State of California, a partner and/or owner at law office of Defendant LAWFIRM. Defendant MOORE is a "debt collector" as defined by 15 U.S.C. §1692a(6). At all relevant times was engaged, by use of the mails, in attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

13.     Defendants Does 1-10 are currently unknown to plaintiff. Complaint will be amended when facts are discovered regarding unknown parties.

## V.    FACTUAL ALLEGATIONS

1.  Plaintiff brings this action on her own behalf.

2.  On or about March 14, 2017, April 14, 2017, and July 12, 2017, Plaintiff sent Defendant BANA Notices of Dispute, demanding validation of an alleged account with Defendant BANA. Said notices included demand that the claim of debt was valid, free from any claims and defects, whether there was a breach of agreement, whether there was a failure of consideration or material alterations, whether the alleged account was transferred, and that the original lender provided value. Also, the demand included a request for a complete statement of damages and losses incurred by BANA.

3.  In responses made by BANA (constituting non-responses), they simply stated:

    The account was opened on September 9, 2015
    The current balance is $4,326.14

4.  In an August 16, 2017 response from BANA, it was stated that "As a result of your inquiry, we've contacted the appropriate consumer reporting agencies and asked them to update your account as five payments past due." Nowhere was it ever stated that BANA would report Plaintiff's dispute.

5.  On or about October 11, 2017 (two times on this date), October 25, 2017, November 22, 2017, December 26, 2017, December 27, 2017, January 8, 2018, and January 23, 2018 Defendant LAWFIRM impermissibly pulled Plaintiff's credit report through Defendant EXPERIAN a total of 8 times, without prior authorization from Plaintiff.

6. On or about November 7, 2017, and November 26, 2017, Plaintiff sent Defendant LAWFIRM Notices of Dispute, demanding validation of an alleged account with Defendant BANA. Said notices included demand that the claim of debt was valid, free from any claims and defects, whether there was a breach of agreement, whether there was a failure of consideration or material alterations, whether the alleged account was transferred, and that the original lender provided value by sourcing the funds from creditor's account. Also, the demand included a request for a complete statement of damages and losses incurred by BANA.

7. In responses made by LAWFIRM (constituting non-responses), they simply stated:

The account was opened on September 9, 2015
The current balance is $4,326.14

8. On or about March 14, 2017, April 14, 2017, April 21, 2017, May 30, 2017 and July 12, 2017, Plaintiff sent Defendants EXPERIAN and TRANS Notices of Dispute of the accounts with Defendant BANA.

9. Plaintiff has not received authentic evidence regarding the validity of the debt.

10. CRAs contacted Defendant BANA requesting reinvestigation of the alleged debt.

11. Plaintiff has disputed the accuracy of the derogatory and inaccurate information reported by BANA to the CRAs via certified mail to BANA, LAWFIRM and CRAs as referenced above. Upon information and belief, Defendant BANA has not provided notice of this disputed matter to the CRAs and is therefore in violation of 15 U.S.C. § 1681s-2(b), and any other applicable statute. The accuracy that is disputed consists of: demand that the claim of debt was valid, free from any claims and defects, whether

SECOND AMENDED COMPLAINT  Page 10 of 36

there was a breach of agreement, whether there was a failure of consideration or material alterations, whether the alleged account was transferred, and that the original lender provided value by sourcing the funds from creditor's account.

12. Defendants BANA and LAWFIRM did not timely respond to Plaintiff's Notices of Dispute by providing evidence of the alleged debt to Plaintiff nor to the CRAs.

13. The disputes brought in Plaintiff's notices to BANA and LAWFIRM, disputing the fact that BANA used "any of their own capital, funds, money or money equivalents to pay for any charges on the alleged account.", as well as disputing the fact that BANA is performing according to the agreement (breach), and disputing the fact that BANA provided value.

14. Upon information and belief, Defendants EXPERIAN and TRANS have not reported Plaintiff's notice of dispute, or in the alternative, have reported and then removed the dispute.

15. Upon information and belief, Defendant EQUIFAX failed to protect sensitive information in its records regarding Plaintiff.

## VI. CAUSES OF ACTION

### FIRST CAUSE
### VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C.§1681
### BY DEFENDANT BANA

16. All above paragraphs are incorporated herein.

17. Section 623(a) of the FCRA describes the duties of furnishers to provide accurate information to CRAs. Section 623(a)(1)(B) prohibits furnishers from providing information relating to a consumer to any CRA if (i) the person has been notified by

the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and (ii) the information is, in fact, inaccurate.

18. Section 623(b)(1) of the FCRA requires furnishers of information to conduct an investigation when the furnisher receives a notice of dispute from a CRA in accordance with the provisions of Section 611(a)(2) of the FCRA, 15 U.S.C. §1681i(a)(2). Defendant BANA is required, under the Fair Credit Reporting Act, to conduct the investigation and notify the consumer of the results within 30 days of the request. See Section 623a(8)(E) [15 U.S.C. §1681a(8)(E)]. BANA's response was inadequate to comply with this requirement. (See Factual Allegations, #2)

19. Section 623(a)(3) of the FCRA concerns the reporting of information to consumer reporting agencies once the consumer has notified the furnisher that information is disputed. That section states that when a consumer disputes the completeness or accuracy of any information furnished to a consumer reporting agency, the information in question may not then be furnished without notice that it is disputed by the consumer. That provision addresses the furnisher's obligation only when the furnisher continues to report disputed information. The statute is silent on the matter of the furnisher ceasing to report information while it is investigating the dispute. It is thus the opinion of the Commission staff that a furnisher temporarily ceases to report disputed information while it investigates the matter, and then either (1) corrects the information if its investigation results in agreement with the consumer or (2) reports the item as disputed by the consumer where that is the result of the investigation, would comply with Section 623(a).

See: https://www.ftc.gov/policy/advisory-opinions/advisory-opinion-harvey-12-23-97

20. Under section 623(a)(3), after receiving a notice of dispute from a consumer, Furnishers are required to meet a disclosure requirement by providing a notice of dispute to the CRAs within a timely manner. However, Defendant BANA failed to meet this condition of disclosure by not placing a "notice of dispute" on Plaintiff's account within the (30) day time period. See Exhibit " **A**"

21. On more than one occasion, Defendant BANA reported inaccurate derogatory information to one or more CRAs as defined by 15 U.S.C. §1681a. Due to the securitization, BANA is not a holder in due course, and therefore cannot have incurred a loss, and therefore reported inaccurate derogatory information.

22. On more than one occasion, Plaintiff sent a written request to Defendant BANA, under the Fair Credit Reporting Act, disputing the information and demanding that Defendant investigate the accuracy of the derogatory information that it reported.

23.   15 U.S.C. §1681a (8)(E) states in relevant part:

> **(E)Duty of person after receiving notice of dispute** After receiving a notice of dispute from a consumer pursuant to subparagraph (D), the person that provided the information in dispute to a consumer reporting agency shall—
> **(i)**
> conduct an investigation with respect to the disputed information;
> **(ii)**
> review all relevant information provided by the consumer with the notice;
> **(iii)**
> complete such person's investigation of the dispute and report the results of the investigation to the consumer before the expiration of the period under section 1681i(a)(1) of this title within which a consumer reporting agency would be required to complete its action if the consumer had elected to dispute the information under that section; and

(iv)

if the investigation finds that the information reported was inaccurate, promptly notify each consumer reporting agency to which the person furnished the inaccurate information of that determination and provide to the agency any correction to that information that is necessary to make the information provided by the person accurate.

24. Defendant BANA has continued to report inaccurate information, or failed to report true information, to the CRAs even after receiving notice of dispute from Plaintiff (See Exhibit "**B**" Plaintiff's notice of dispute). The CRAs contacted BANA (furnisher)(See Exhibit "**C**"), and BANA failed to report the dispute within 30 days. (See Exhibit "**D**"). The inaccurate information that BANA reported, inter alia, was an amount due of $4,545.00 (Trans); $4,436.00 (Experian). The amount reported should be 0.00. Section 609(c)(2)(E) states: "a consumer reporting agency is not required to remove accurate derogatory information from a consumer's file, unless the information is outdated under section 605 or cannot be verified." However, since Plaintiff challenged BANA to verify, and they did not, that means all financial institutions and credit reporting agencies concerned with Plaintiff's account are required to remove any derogatory information. It cannot be deemed "accurate" if it cannot be "verified". If it cannot be verified, then it is required to be removed, according to the FCRA.

25. As a direct and proximate result of Defendants' (BANA) conduct, Plaintiff has and will continue to suffer damages. Plaintiff seeks damages in the amount of $1,000 pursuant to 15 U.S.C. §1681o.

26. Consumers can maintain a private action against furnishers of information under Section 1681s-2(b). See *Dornhecker v. Ameritech Corp.*, 99 F. Supp. 2d 918 (N.D. Ill.

2000); *DiMezza v. First USA Bank, Inc.*, 103 F. Supp. 2d 1296 (D.N.M.

2000); *Campbell v. Baldwin*, 90 F. Supp. 2d 754 (E.D.Tex.2000).

## SECOND CAUSE
### VIOLATION OF FAIR CREDIT REPORTING ACT (FCRA),
### 15 U.S.C. §1681e(b)
### BY DEFENDANTS EXPERIAN and TRANS

27. All above paragraphs are incorporated herein.

28. Defendants failed to adopt and follow "reasonable procedures" to assure the maximum possible accuracy of Plaintiff's consumer credit and other personal information, as required by the FCRA, which they compiled, used and manipulated, in order to prepare consumer reports, credit scores, risk factor/denial codes and other economic and prediction data evaluations.

29. Defendants have continually added, stored, maintained and disseminated personal and credit information, in consumer reports they each prepared and issued, about the Plaintiff which was inaccurate, false, erroneous and misleading despite notice from the Plaintiff that such information was inaccurate. Defendants have failed and refused to report Plaintiff's disputes in its reports.

30. Defendants have wilfully, or alternatively, negligently, violated the FCRA, 15 U.S.C. §1681e(b), or any other applicable statute, on multiple occasions.

31. The FCRA provides that whenever a CRA prepares a consumer credit report, "it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." FCRA, 15 U.S.C. §1681e(b). If a consumer's report contains an inaccuracy, the CRA who generated the inaccurate report may be held liable only if it failed to follow

reasonable procedures. *Guimond, supra* at 1333. Generally, a jury should determine whether a CRA's procedures were reasonable and properly followed. *Id.* Also, see *Bradshaw v. BACHOME LOANS SERVICES, LP, et al.*, 3:10-438 (D.Or. 2011)

32. To make out a prima facie violation under 1681e(b), a consumer must present evidence tending to show that a CRA prepared a report containing inaccurate information. *Guimond* (citing *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991)).

33. These 2 Defendants and Plaintiff contest the accuracy of Plaintiff's credit report. Plaintiff contends that the BANA account was always inaccurately reported because there was not valid debt owed by Plaintiff. Plaintiff asserts that there is no account; if there is an account, it is invalid; and that if it is invalid, there is nothing owed to BANA. Defendants respond that they accurately reported the BANA account because of the investigation results. However, it cannot be concluded that Plaintiff's credit report was accurate as a matter of law. This Court will find that the account status is not dispositive and that a factual dispute exists regarding the accuracy of Plaintiff's report.

34. Because the parties dispute whether these Defendants implemented and followed reasonable procedures to assure maximum possible accuracy, this Court cannot dispose of this claim summarily.

35. As a direct and proximate result of Defendants' conduct, Plaintiff has and will continue to suffer damages.

## THIRD CAUSE
## VIOLATION OF FAIR CREDIT REPORTING ACT (FCRA),
## 15 U.S.C. §1681i(a)
## BY DEFENDANTS EXPERIAN and TRANS

36. All above paragraphs are incorporated herein.

37. Plaintiff advised Defendants, through the furnishers and directly, on multiple occasions, of the false data and demanded that the data be removed from their consumer reports and data files.

38. Defendants failed to properly investigate/reinvestigate Plaintiff's disputes and Defendants continued to prepare and publish false consumer reports.

39. Defendants and furnishers exchanged information about Plaintiff's disputes through their investigation/reinvestigation and CDV/ACDV/UDF/AUDF processes.

40. Defendants and the furnishers were very aware of Plaintiff's disputes, as well as their inadequate and illegal investigation/reinvestigation, and the furnishers' responses to the numerous and varied contacts and their collective decision to leave disputes, false data as attributable to Plaintiff.

41. Pursuant to 15 U.S.C. §1681i, a CRA must reasonably reinvestigate an item in a consumer's credit file once the consumer directly notifies the agency of a possible inaccuracy. 15 U.S.C. §1681i(a)(1)(A). This provision also requires a CRA to review and consider all relevant information submitted by the consumer, promptly provide the credit grantor of the disputed item with all relevant information regarding the dispute, and then promptly delete or modify the item based on the results of the reinvestigation. 15 U.S.C. §1681i(a)(2)(B); 15 U.S.C. §1681i(a)(4); 15

U.S.C. §1681i(a)(5)(A). To state a claim under 15 U.S.C. §1681i(a), Plaintiff must establish that: (1) her credit files contained inaccurate or incomplete information; (2) she notified the CRAs directly of the inaccuracy; (3) the dispute is not frivolous or irrelevant; (4) CRAs failed to respond to the dispute; and (5) CRAs' failure to reinvestigate caused Plaintiff to suffer actual damages. *Thomas v. Trans Union, LLC*, 197 F.Supp.2d 1233, 1236 (D.Or. 2002) (citations omitted).

42. These CRAs did not completely fail to investigate the dispute or ignore an unambiguous public record. Instead these CRAs utilized an automated dispute system to verify the accuracy of Plaintiff's account.

43. Many Courts have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation. *Saenz v. Trans Union, LLC*, 621 F.Supp.2d 1074, 1083-84 (D.Or. 2007) (discussing cases); see also *Cushman*, 115 F.3d at 225 ("The 'grave responsibility' imposed by §1681i(a) must consist of something more than merely parroting information received from other sources."); *Apodaca v. Discover Fin. Servs.*, 417 F.Supp.2d 1220, 1230-31 (D.N.M. 2006) (noting that CRAs may not rely on automated procedures that make only superficial inquires once the consumer has notified it that the information is disputed); *Lambert v. Beneficial Mortg. Corp.*, No. 3:05-cv-05468-RBL, 2007 WL 1309542, at *4-5 (W.D. Wash. May 4, 2007) (finding a question of fact as to whether the ACDV sent by the CRA contained sufficient information to comply with its reinvestigation duties). After this Court reviews the ACDV obtained through discovery, it will not

conclude that CRAs' reinvestigations were reasonable as a matter of law.

44. Plaintiff has met her prima facie showing of inaccuracy. These CRAs do not

dispute that Plaintiff sent letters to them notifying them of relevant, allegedly

inaccurate information.

45. Defendants have wilfully, or alternatively, negligently, violated the FCRA, 15

U.S.C. §1681i(a), or any other applicable statute, on multiple occasions.

46. As a direct and proximate result of Defendants' conduct, Plaintiff has and will

continue to suffer damages.

## FOURTH CAUSE
## VIOLATION OF FAIR CREDIT REPORTING ACT (FCRA), 15 U.S.C. §1681i(c) BY DEFENDANTS EXPERIAN and TRANS

47. All above paragraphs are incorporated herein.

48. Defendants failed to employ reasonable procedures to mark as disputed the

various accounts contested by Plaintiff and which appeared in Plaintiff's consumer

credit files and reports and to notify third parties, upon those inquiries, of the

disputed nature of the account reporting.

49. Defendants wilfully, or alternatively, negligently, violated the FCRA, 15 U.S.C.

§1681i(c), or other applicable statute.

50. As a direct and proximate result of Defendants' conduct, Plaintiff has and will

continue to suffer damages.

## FIFTH CAUSE
## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT (FDCPA), 15 U.S.C. §1692 BY DEFENDANTS LAWFIRM and MOORE

51. All above paragraphs are incorporated herein.

52. In connection with the collection of a debt, Defendants LAWFIRM and MOORE, directly or indirectly, used false, deceptive, or misleading representations or means, including failure to communicate to the CRA that the debt is disputed, in violation of Section 807(8) of the FDCPA, 15 U.S.C. §1692e(8). A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. The following conduct is a violation of this section:

> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed. (Emphasis added)

53. Pursuant to 15 U.S.C. §1692g(b), if the consumer notifies the debt collector in writing within thirty (30) days after receipt of an initial communication from debt collector that the debt is disputed, "the debt collector **shall cease** collection of the debt…until the debt collector obtains verification of the debt…and a copy of such verification…is mailed to the consumer." (Emphasis added) As stated by the Sixth Circuit in *Purnell v. Arrow Financial Services LLC*, 303 Fed.Appx. 297, 304 (2008), a debt collector who receives a demand for verification "has a choice: it either may choose not to verify the debt and abandon its collection efforts, or it may decide to verify the debt and resume collection activities once the requested validation has been provided. We find that the language of §1692g(b) dictates that each 'failure' to cease' collection activity without having validated the debt – like each 'communication' of false credit information under 15 U.S.C. §1692e(8) – presents a discrete claim for violation of the FDCPA…" In the instant case, Defendants

LAWFIRM and MOORE violated the FDCPA by not validating the alleged debt, and subsequently, filed judicial action against Plaintiff (Superior Court of California, Kern County, Case #BCL-18-010674). See *Haddad v. AZDF*, 758 F.3d 777 (6th Cir. 2014). The accuracy that is disputed consists of: demand that the claim of debt was valid, free from any claims and defects, whether there was a breach of agreement, whether there was a failure of consideration or material alterations, whether the alleged account was transferred, and that the original lender provided value by sourcing the funds from creditor's account.

## Validation

54. Validation requires presentation of the account and general ledger statement signed and dated by the party responsible for maintaining the account. See *Pacific Concrete F.C.U. v. Kauanoe*, 62 Haw. 334, 614 P. 936 (1980); *GE Capital Hawaii, Inc. v. Yonenaka*, 25 P.3d 807, 96 Hawaii 32 (Hawaii App 2001). These Defendants failed and provided nothing more than copies of what appeared to be account statements, which were unverified.

55. Some courts have held that responsive documents must address the issue raised by the debtor. According to this view, the sufficiency of the verification response enclosing documentation must be responsive to the nature of the dispute raised in order to satisfy the statute (15 U.S.C. §1692g(b)). In *Lamb v. M&M Assocs., Inc.*, No. C-3-96-463, 1998 WL 34288694 (S.D. Ohio Sept. 1, 1998), the court held that sending documentation from the original creditor was insufficient to verify the debt because it did not meet the substance of the debtor's dispute. The consumer received a demand for payment of $86.39, and in response, she sent the

debt collector a request to "provide...proof of the exact breakdown of the above stated amount since my final bill and the amount you are demanding of me are not the same." *Id.* at *2. In response, the debt collector sent a letter demanding $88.91, and a copy of the consumer's final statement, which listed the amount owed as $63.99, plus a monthly late fee of $4.00. *Id.* The court found that where "the amount set forth on that original bill differs from the amount the debt collector is attempting to collect, merely providing a copy of that bill does not satisfy the obligation imposed by §1692g(b)." *Id.* at *9. The Court's conclusion that the bill did not suffice as verification because it did not explain the difference between the amount previously claimed and the amount subsequently shown to be due, *Id.*, suggests that verification must not only be responsive to the dispute raised, but also must corroborate the exact amount claimed to be due. Here, LAWFIRM and MOORE failed to explain why the amounts shown on the CRA reports, the credit card statements and the Complaint (Superior Court of California, Kern County, Case #BCL-18-010674) differ. (*cf. Sasscer v. Donnelly*, No. 3:10-cv-464, 2011 WL 1522320 (M.D.Pa. Apr. 20, 2011)(genuine issue of material fact in dispute) and *Dunham v. Portfolio Recovery Assocs., LLC*, No. 4:09-cv-00086-JHL, 2009 WL 3784236 (E.D. Ark. Nov. 10, 2009)(The Court concluded despite the affidavit, the verification response was insufficient because "Dunham had no way to know when or to whom he had incurred the debt and whether the debt was still owed . . . . Simply repeating second-or third-hand information in the debt collector's file . . . is insufficient under the statute.")).

56. 15 U.S.C. §1692k(a)(1) and (a)(2)(A) state that "…any debt collector who fails to comply with any provision of this title with respect to any person is liable to such person in an amount equal to the sum of any actual damage sustained by such person as a result of such failure; in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000."

57. As a direct and proximate result of Defendants' conduct, Plaintiff has and will continue to suffer damages. Plaintiff seeks damages in the amount of $1,000 pursuant to 15 U.S.C. §1692k.

## SIXTH CAUSE
## VIOLATION OF FAIR CREDIT
## REPORTING ACT (FCRA), 15 U.S.C. §1681b
## BY DEFENDANTS LAWFIRM and MOORE

58. All above paragraphs are incorporated herein.

59. Plaintiff is an unsophisticated consumer. Plaintiff attempts to further persuade this Court of the facts and law supporting her claim herein.

60. Defendants LAWFIRM and MOORE are debt collectors and have violated the FCRA. Defendants impermissibly pulled Plaintiff's credit report before they properly validated the alleged debt/account. There must first be a valid debt in order for Defendants to have a permissible purpose.

61. Defendants LAWFIRM and MOORE's violations for the Fair Credit Reporting Act 15 U.S.C. §1681b, or other applicable statute, which prohibits impermissible purposes for Account Review Inquiry; pulling consumer credit reports. On at least 8

separate occasions, Defendants LAWFIRM and MOORE impermissibly pulled

Plaintiff's credit report.

62. Specifically, on October 11, 2017 (two times on this date), October 25, 2017

and November 22, 2017, December 26, 2017, December 27, 2017, January 8,

2018, and January 23, 2018 Defendant LAWFIRM impermissibly pulled Plaintiff's

credit report through Defendant EXPERIAN, without prior authorization from

Plaintiff. See Exhibit "E".

63. 15 U.S.C. §1681b(a)(3)(A) states in pertinent part:

> (3). To a person which it has reason to believe
> (A) intends to use the information in connection with a credit transaction
> involving the consumer on whom the information is to be furnished and
> involving the extension of credit to, or review or collection of an account of
> the consumer, or

64. The word "it" as used in this statute, refers to the consumer reporting agency.

65. 15 U.S.C. §1681b(f) states:

> (f) *Certain use or obtaining of information prohibited.* A person shall not use or
> obtain a consumer report for any purpose unless
> (1) the consumer report is obtained for a purpose for which the consumer
> report is authorized to be furnished under this section; and
> (2) the purpose is certified in accordance with section 607 [§ 1681e] by a
> prospective user of the report through a general or specific certification.

66. 15 U.S.C. §1681e(a) states:

> (a)IDENTITY AND PURPOSES OF CREDIT USERS
> Every consumer reporting agency shall maintain reasonable procedures designed
> to avoid violations of section 1681c of this title and to limit the furnishing of
> consumer reports to the purposes listed under section 1681b of this title. These
> procedures shall require that prospective users of the information identify
> themselves, certify the purposes for which the information is sought, and certify
> that the information will be used for no other purpose. Every consumer reporting
> agency shall make a reasonable effort to verify the identity of a new prospective
> user and the uses certified by such prospective user prior to furnishing such user

a consumer report. No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title.

67. Upon information and belief, Plaintiff claims that Defendants LAWFIRM and

MOORE did not certify their purpose for the pull in accordance with 15 U.S.C.

§1681e as required under 15 U.S.C. §1681b(f)(2). It is a known fact that the CRAs

do not confirm that creditors and collectors are certified for the purpose in which

they make each electronic pull. The creditor and collector are only required to

make certification with the CRA upon their initial application for an account number.

68. Plaintiff did not authorize LAWFIRM and MOORE to pull her report. Plaintiff

does not have a business relationship with LAWFIRM and MOORE; nor has there

ever been a creditor-debtor relationship between them.

69. FCRA in 15 U.S.C. 1681a(r)(4) states: The terms "account" and "electronic fund

transfer" have the same meanings as in section 1693a of this title.

> (2) the term "account" means a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in section 103(i) of this Act), as described in regulations of the Board, established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement;

70. The definition of "account" clearly does not include an account such as a credit

card open end credit account but does include a demand deposit account, savings

deposit or other asset account which is wholly different. The Defendant here was

attempting to collect on an alleged account with BANA where Plaintiff never had

any such account, so there was no permissible purpose for the credit pull.

71. As a direct and proximate result of Defendants' conduct, Plaintiff has and will continue to suffer damages. Plaintiff seeks damages in the amount of $1,000 pursuant to 15 U.S.C. §1681n.

## SEVENTH CAUSE
## BREACH OF CONTRACT-FRAUD
## BY DEFENDANT BANA

72. All above paragraphs are incorporated herein.

73. In making a valid claim for collection of a debt, a creditor must be the holder in due course, show that money left the creditor's account (to pay for merchant purchases), and show that it did not sell or securitize the credit card agreement. Money must have changed hands from the creditor to the debtor in order for the debtor to be obligated to the creditor.

74. In the instant case, BANA did not provide any of its own money to Plaintiff.

75. BANA have breached the alleged contract by not disclosing the fact that it did not use its own money, committing acts of *ultra vires*, and that it securitized the credit card agreement. This act constitutes fraud. Fraud vitiates the most solemn contract.

76. Since the credit card agreement was securitized, BANA is not holder in due course, which is *fraud in the factum*.

77. The undisclosed securitization, which BANA uses, works like this:

**Securitizations**
> 73. Financial assets such as mortgage loans, automobile loans, trade receivables, credit card receivables, and other revolving charge accounts are assets commonly transferred in securitizations. Securitizations of mortgage loans may include pools of single-family residential mortgages or other types of real estate mortgage loans, for example, multifamily residential mortgages and commercial

property mortgages. Securitizations of loans secured by chattel mortgages on automotive vehicles as well as other equipment (including direct financing or sales-type leases) also are common. Both financial and nonfinancial assets can be securitized; life insurance policy loans, patent and copyright royalties, and even taxi medallions also have been securitized. But securitizations of nonfinancial assets are outside the scope of this Statement.

74. An originator of a typical securitization (the transferor) transfers a portfolio of financial assets to an SPE, commonly a trust. In "pass-through" and "pay-through" securitizations, receivables are transferred to the SPE at the inception of the securitization, and no further transfers are made; all cash collections are paid to the holders of beneficial interests in the SPE. In "revolving-period" securitizations, receivables are transferred at the inception and also periodically (daily or monthly) thereafter for a defined period (commonly three to eight years), referred to as the revolving period. During the revolving period, the SPE uses most of the cash collections to purchase additional receivables from the transferor on prearranged terms.

75. Beneficial interests in the SPE are sold to investors and the proceeds are used to pay the transferor for the assets transferred. Those beneficial interests may comprise either a single class having equity characteristics or multiple classes of interests, some having debt characteristics and others having equity characteristics. The cash collected from the portfolio is distributed to the investors and others as specified by the legal documents that established the SPE.

See *Statement of Financial Accounting Standards No. 140*, Financial Accounting Standards BANArd, September 2000 (FASB FAS140)

78. Also, credit card securitization is explained on the government's website:

### THE TRANSACTION

In a credit card securitization transaction only the receivables are sold, not the accounts that generate the receivables. The financial institution retains legal ownership of the credit card accounts and can continue to change the terms on the accounts. Accounts corresponding to securitized loans are typically referred to as the designated accounts (or sometimes trust accounts). The initial outstanding balances on the designated accounts are sold to the trust as are the rights to any new charges on the designated accounts. Subsequently, as cardholder purchase activity generates more receivables on the designated accounts, these new receivables are purchased by the trust from the originating institution/seller/transferor. The trust uses the monthly principal payments received from the cardholders to acquire these new charges or receivables. When the securitization is initially set up, the originating institution/seller adds sufficient receivables to support the principal balance of the certificates plus an additional amount (seller's interest) that serves to absorb fluctuations in the outstanding balance of the receivables. The originating institution/seller will make

subsequent additions to the trust in order to keep the seller's interest at the required level.

See: Exhibit "**F**"
https://www.fdic.gov/regulations/examinations/credit_card_securitization/ch2.html

79. So, the breach is due to the fact that BANA failed to disclose the above information in their credit card agreement prior to soliciting Plaintiff to become bound by it. See Exhibit "**G**".

80. Due to the breach, and lack of disclosure, BANA has, directly or indirectly, used false, deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA, 15 U.S.C. §1692e, which constitutes fraud.

81. Due to the securitization, BANA is not a holder in due course, and therefore cannot have incurred a loss.

82. Plaintiff seeks damages in the amount of $5,000.

83. As a direct and proximate result of BANAs' conduct, Plaintiff has and will continue to suffer damages.

## EIGHTH CAUSE
## BREACH OF CONTRACT-NEGLIGENCE
## BY DEFENDANT EQUIFAX

84. All above paragraphs are incorporated herein.

85. On September 7, 2017, Defendant publicly acknowledged a cybersecurity incident ("Data Breach") that has potentially impacted approximately half of all U.S. consumers who have credit histories. Defendant admitted that it discovered this data breach on July 29, 2017, and that the unauthorized access to its files, including Plaintiffs' PII, started in mid-May 2017.

86. Rather than timely disclose its data breach, Defendant waited almost six (6) weeks to publicly disclose the occurrence. In the interim, three EQUIFAX executives sold some $1.8 million of EQUIFAX stock. These executives include Chief Financial Officer John Gamble, who sold approximately $946,000 worth of EQUIFAX stock on August 1, 2017; President of United States Information Solutions Joseph Loughran, who sold approximately $584,000 of EQUIFAX stock, also on August 1, 2017; and President of Workforce Solutions Rodolfo Ploder, who sold approximately $250,000 of EQUIFAX stock on August 2, 2017.

87. Upon accepting and storing PII of Plaintiff in its computer systems and on its networks, Defendant undertook and owed a duty to Plaintiff to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendant knew that the PII was private and confidential and should be protected as private and confidential.

88. Defendant owed a duty of care not to subject Plaintiff, along with his PII, to an unreasonable risk of harm because he was a foreseeable and probable victim of an inadequate security practices.

89. Defendant owed numerous duties to Plaintiff, including the following:

   a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting PII in its possession;

   b. To protect PII using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

   c. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

90. Defendant also breached its duty to Plaintiff to adequately protect and safeguard PII by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII. Furthering their dilatory practices, Defendant failed to provide adequate supervision and oversight of the PII with which they were and are entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII of Plaintiffs', misuse the PII and intentionally disclose it to others without consent.

91. Defendant knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of its data security systems, and the importance of adequate security. Defendant knew about the previous data breaches at EQUIFAX.

92. Defendant knew, or should have known, that their data systems and networks did not adequately safeguard Plaintiff's PII.

93. Defendant breached its duties to Plaintiff by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII of Plaintiffs'.

94. Because Defendant knew that a breach of its systems would damage millions of individuals, including Plaintiff, Defendant had a duty to adequately protect their data systems and the PII contained therein.

95. Defendant has a special relationship with Plaintiff. Plaintiffs' willingness to entrust Defendant with his PII was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems and the PII it stored on them from attack.

96. Defendant also had independent duties under state and federal laws that required Defendant to reasonably safeguard Plaintiffs' PII and promptly notify him about the data breach.

97. As a result of the EQUIFAX Data Breach, Plaintiffs' PII has been exposed to criminals for misuse. The injuries suffered by Plaintiff, or likely to be suffered by Plaintiff as a direct and proximate cause and result of the EQUIFAX Data Breach include:

   a. unauthorized use of his PII;

   b. theft of his personal and financial information;

   c. costs associated with the detection and prevention of identity theft and unauthorized use of his financial accounts;

   d. damages arising from the inability to use his PII;

   e. loss of use of and access to his account funds and costs associated with inability to obtain money from his account or being limited in the amount of money he was permitted to obtain from his account, including missed payments on bills and loans, late charges and fees, and adverse effects on his credit including decreased credit scores and adverse credit notations;

   f. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, purchasing credit monitoring and identity theft protection services, and the stress, nuisance

and annoyance of dealing with all issues resulting from the Data Breach;

g. the imminent and certainly impending injury flowing from potential fraud and identity theft posed by his PII being placed in the hands of criminals and already misused via the sale of Plaintiffs' information on the Internet black market;

h. damages to and diminution in value of his PII entrusted to Defendant for the sole purpose of purchasing products and services from Defendant; and

i. the loss of Plaintiffs' privacy.

98. Defendants' negligence may have contributed to the false accounts that Defendants claim to belong to Plaintiff.

99. Through Defendant's acts and omissions described in this Complaint, including Defendant's failure to provide adequate security and its failure to protect PII of Plaintiffs' from being foreseeably captured, accessed, disseminated, stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure PII of Plaintiffs' during the time it was within Defendant's possession or control.

100. The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the PII to Plaintiff so that Plaintiff can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of his PII.

101. Defendant breached its duty to notify Plaintiff of the unauthorized access by waiting many months after learning of the Data Breach to notify Plaintiff and then

by failing to provide Plaintiff information regarding the Data Breach until September 2017. To date, Defendant has not provided sufficient information to Plaintiff regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Plaintiff.

102. Plaintiff brings this action to remedy these harms on behalf of himself, whose PII was accessed during Defendant's data breach. Plaintiff seeks the following remedies, among others: statutory damages under the FCRA, FDCPA and state law causes of action, reimbursement of out-of-pocket losses, other compensatory damages, further and more robust credit monitoring services with accompanying identity theft insurance, and injunctive relief including an order requiring Defendant to implement improved data security measures.

103. Plaintiff did not contribute to the Data Breach and subsequent misuse of his PII as described in this complaint.

104. As a direct and proximate result of Defendants' conduct, Plaintiff has and will continue to suffer damages.

## VII. RELIEF SOUGHT

### INJUNCTION FOR VIOLATIONS OF THE
### FDCPA, CFDCPA and FCRA

105. This Court is authorized to issue a permanent injunction to ensure that: Defendants, as applicable, will not continue to violate, the FCRA, CFDCPA, and the FDCPA.

106. This Court is authorized to immediately order BANA to permanently remove all reference to the alleged debt.

## VIII. PRAYER FOR DAMAGES

**WHEREFORE,** plaintiff prays that this Court enter a judgment for plaintiff,

against Defendants by:

(a) Against Defendant BANA in the amount of $1,000;

(b) Against EXPERIAN in the amount of $5,000;

(c) Against TRANS in the amount of $5,000;

(d) Against EQUIFAX in the amount of $50,000;

(e) Against Defendant LAWFIRM in the amount of $1,000;

(f) Against Defendant LAWFIRM in the amount of $2,500 (CCC 1785.19);

(g) Against Defendant MOORE in the amount of $1,000;

(h) Against each Defendant in the amount of $5,000;

(i) Award Plaintiff the costs of bringing this action, as well as other and additional

relief as the Court may determine to be just and proper. See *Guimond v. Trans Union*

*Credit Information Company*, 45 F.3d 1329 (9th Cir. 1995) (Even without pecuniary or

out-of-pocket loss, may recover actual damages for the mere injury to reputation or

creditworthiness caused by the delinquencies appearing on credit report.) and *Gertz*

*v. Robert Welsh, Inc.*, 418 U.S. 323 (1974) *cf. Jorgeson v. TRW, Inc.*, C.A. No. 96-286

(D.Or. 1998)(emotional distress); *Valentine v. Equifax Information Servs, LLC, et al.*,

U.S.Dist Ct. (Or) Case No. 05-cv-0801-JO (emotional distress); *Acton v. Bank One*

*Corp.*, 293 F.Supp.2d 1092, 1101 (D.Ariz. 2003) citing *Zhang v. Am. Gem Seafoods,*

*Inc.*, 339 F.3d 1020 1040 (9th Cir. 2003); *Johnson v. Hale*, 13 F.3d 1351, 1352-53

(9th Cir. 1994) (objective evidence not a requirement for emotional distress). *Safeco*

*Ins. Co. of Am. V. Burr*, 551 U.S. 47, 57 (2007) (punitive damages for willful failure to comply with any requirement of the FCRA. 15 U.S.C. §1681n(1)).

(j) Where the issue of damages depends on whether a violation of the FCRA occurred, the question of damages is generally reserved for the jury. *Cairns v. GMAC Mortg. Corp.*, No. CIV 04-1840-PHX-SMM, 2007 WL 735564, *7 (D. Ariz. Mar, 5, 2007).

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable. Respectfully submitted

this ___9th___ day of ___July___ , 2018.

Myung Jin Myra Kozlowski, Plaintiff, In Pro Per

## VERIFICATION

STATE OF CALIFORNIA
COUNTY OF KERN

I have read the foregoing Complaint and knows its contents.

I am the Plaintiff, a party to this action, and am authorized to make this verification. The matters stated in the foregoing document are true and of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Myung Jin Myra Kozlowski, Plaintiff, In Pro Per

DAY 32

Exhibit A

**Archived Reports**   **Bureau**

Apr 21, 2017 - ...   ⌄   | Experian | Equifax® | TransUnion® | Compare All |   ⊜

Experian

Summary   **Accounts**   Collections   Inquiries   Public Records

Print My Experian Credit Report

Print Only This Page
Lock Your Credit Report

## View All Accounts

◀ **Previous**   **Next** ▶

### BK OF AMER

**Details**

| | |
|---|---|
| Account # | **XXXX** |
| Original Creditor | - |
| Company Sold | - |
| Account Type | **Credit Card - Revolving Terms** |
| Date Opened | **Sep 1, 2015** |
| Account Status | **Open** |
| Payment Status | **Current** |
| Status Updated | **Apr 1, 2017** |
| Usage | **106%** |
| Balance | **$4,436** |
| Balance Updated | **Apr 4, 2017** |
| Credit Limit | **$4,200** |
| Monthly Payment | **$245** |
| Past Due Amount | - |
| Highest Balance | **$4,436** |
| Terms | **Revolving** |
| Responsibility | **Individual** |
| Your Statement | - |
| Comments | - |

(no dispute reported)

### Contact Information

PO BOX 982238 EL PASO, TX 79998 (800) 421-2110

_Day 64_

_Exhibit A_

## Archived Reports

**Bureau**

May 23, 2017 ⌄

| Experian | Equifax® | TransUnion® | Compare All | 🖨 |

_Experian_

Print My Experian Credit Report

Print Only This Page

Your Next Experian Credit Report is available in **23 days**.

Summary   **Accounts**   Collections   Inquiries   Public Records      🔒 Lock Your Credit Report

## View All Accounts

◀ **Previous**   **Next** ▶

### BK OF AMER

**Details**

| | |
|---|---|
| Account # | **XXXX** |
| Original Creditor | **-** |
| Company Sold | **-** |
| Account Type | **Credit Card - Revolving Terms** |
| Date Opened | **Sep 1, 2015** |
| Account Status | **Open** |
| Payment Status | **Current** |
| Status Updated | **Apr 1, 2017** |
| Usage | **106%** |
| Balance | **$4,436** |
| Balance Updated | **Apr 4, 2017** |
| Credit Limit | **$4,200** |
| Monthly Payment | **$245** |
| Past Due Amount | **-** |
| Highest Balance | **$4,436** |
| Terms | **Revolving** |
| Responsibility | **Individual** |
| Your Statement | **-** |
| Comments | - |

_(no dispute reported)_

Exhibit A

**Archived Reports**

**Bureau**

<u>TransUnion</u>

Apr 17, 2017 ⌄ | Experian® | Equifax® | | Compare All | ⊜

Print My TransUnion Credit Report

Summary    **Accounts**    Collections    Inquiries Print Only This Page Records

## View All Accounts

◀ Previous  Next ▶

### BK OF AMER

**Details**

| | |
|---|---|
| Account # | **XXXX** |
| Original Creditor | **-** |
| Company Sold | **-** |
| Account Type | **Revolving account** |
| Date Opened | **Sep 9, 2015** |
| Account Status | **Open** |
| Payment Status | **30 days past due** |
| Status Updated | **Apr 7, 2017** |
| Usage | **106%** |
| Balance | **$4,436** |
| Balance Updated | **Apr 7, 2017** |
| Credit Limit | **$4,200** |
| Monthly Payment | **$153** |
| Past Due Amount | **$245** |
| Highest Balance | **$4,436** |
| Terms | **Minimum** |
| Responsibility | **Individual account** |
| Your Statement | **-** |
| | **-** |

(no dispute reported)

### Contact Information

PO BOX 982238 EL PASO, TX 79998 (800) 421-2110

Day 64

Exhibit A

## Archived Reports

**Bureau**

TransUnion

May 23, 2017  ⌄  | Experian® | Equifax® | TransUnion | Compare All | 🖨

Print My TransUnion Credit Report

Summary  **Accounts**  Collections  Inquiries  Print Only This Page  Public Records

### View All Accounts

◀ **Previous**  **Next** ▶

### BK OF AMER

**Details**

| | |
|---|---|
| Account # | **XXXX** |
| Original Creditor | **-** |
| Company Sold | **-** |
| Account Type | **Revolving account** |
| Date Opened | **Sep 9, 2015** |
| Account Status | **Closed** |
| Payment Status | **60 days past due** |
| Status Updated | **May 1, 2017** |
| Usage | **108%** |
| Balance | **$4,545** |
| Balance Updated | **May 1, 2017** |
| Credit Limit | **$4,200** |
| Monthly Payment | **$551** |
| Past Due Amount | **$398** |
| Highest Balance | **$4,545** |
| Terms | **Minimum** |
| Responsibility | **Individual account** |
| Your Statement | **-** |
| Comments | **-** |

(no dispute reported)

### Contact Information
PO BOX 982238 EL PASO, TX 79998 (800) 421-2110

# EXHIBIT B

Myung Jin Myra Kozlowski
3816 Vista De Lago Ct
Bakersfield, CA, 93311

To: Paul M. Donofrio, CFO
Bank of America
100 North Tryon Street
Charlotte, NC, 28255

March 14, 2017

**Certified Mail Number** 7016-0910-0001-6224-4531
**RE:** Bank of America Account No. 4400-6699-3083-4064

## NOTICE OF DISPUTE

Dear Mr. CFO Paul Donofrio:

Thank you for the statement of March 9, 2017 that your institution recently sent me, expecting payment for an alleged debt.

This Notice is to confirm that your claim is disputed under 15 USC § 1692 *et seq*. Please verify under oath that this claim is valid, free from any claims and defenses including but not limited to: any breach of agreement, failure of consideration or material alterations, and that the original lender provided value. Further, that the alleged account was transferred in good faith and by the consent of all parties involved.

**After reasonable inquiry I have concluded that Bank of America is in breach of the alleged agreement. The following facts support my position in this matter:**

1. Bank of America failed to disclose to the alleged consumer Myung Jin Myra Kozlowski (hereinafter "consumer") that Bank of America used consumer's note, capital, funds, money or money equivalent to fund a note, check or similar instrument that was used to fund the charges on the alleged account, whereby Bank of America did not perform under the agreement and risked nothing of value.

2. Bank of America has not used any of their own capital, funds, money or money equivalents to pay for any charges on the alleged account.

3. Bank of America received "something-for-nothing" by using the consumer's note(s) to fund charges to the credit card account while retaining payments from consumer.

4.    When accounts are 90 days or more overdue, Bank of America receives a payoff of the amount due from insurance, whose premiums were unknowingly funded by the so-called "borrower".

I am making a request to receive absolute assurance from Bank of America that they did not breach the agreement. In order to settle this matter, please sign or have an authorized officer sign the enclosed affidavit, confirming that you have read the agreement, that you understand GAAP, the bookkeeping entries, accounts receivables and deposits, the banking laws, and the Federal Reserve bank's policies and procedures.

In addition please furnish me with the following information:

1.    A front and back, true and correct copy of the alleged signed agreement bearing my signature (full & complete disclosure), and a detailed copy of the alleged account.

2.    A complete statement of Damages, including each and every loss that Bank of America incurred under the alleged agreement.

3.    A copy of your oath of office confirming you are not violating 15 USC § 1692(e) 3.

4.    A copy of any insurance claim having been made by Bank of America regarding this account.

5.    The name, address and telephone number of Bank of America's CPA auditor.

6.    Verification if this debt has been assigned or sold to a debt collector.

7.    If this debt has been assigned to a debt collector, please provide the commission amount if collection efforts are successful.

8.    If this debt has been sold to a debt collector, please provide the price for which it was sold.

If you cannot verify this debt by the above itemized means, under the **Fair Debt Collection Practices Act 15 USC § 1692**, you really have no right to send me a letter. Wouldn't this be considered mail fraud?

<u>You are required by federal law to furnish the credit bureaus with the required disclosure by placing a "notice of dispute" on my account within (30) days after receiving this dispute letter.</u> I'm tracking dates as well as time-stamped copies of my credit reports, which will show that you have violated the **Fair Credit Reporting Act, Section 623(a)(3) [15 USC § 1681s-2]** if you do not meet the condition of disclosure within the required (30) day period.

During this period of validation, if any action is taken that is considered detrimental to my credit reports, I will certainly pursue legal counsel for suit. This includes listing any information to a credit-reporting repository that could be inaccurate or invalidated. If your offices have or continue to report invalidated information to any of the three major credit bureaus (Equifax, Experian, & TransUnion), this action might constitute fraud under both federal and state laws and directly violate the **Fair Credit Reporting Act**. Hence, if any negative mark is found or continues to appear on any of my credit reports by your company or any company that you represent, without a doubt, I will invoke legal action against you for the following: Violation of the **Fair Credit Reporting Act** and **Defamation** of **Character**.

Most assuredly, your legal staff will agree that non-compliance with this request could violate **Fair Credit Reporting Act, Section 623(a)(3) - Responsibilities of furnishers of information to consumer reporting agencies [15 USC § 1681s-2]**, putting your company in serious legal trouble with the FTC and other state or federal agencies.

All communications and omissions will be made part of and incorporated into any litigation arising from this matter. Failure to verify and validate the debt within thirty (30) days by signing the enclosed affidavit confirms that no further action will be taken and an absolute waiver of any right to collect the alleged debt. Furthermore all references to this account must be deleted and completely removed from my credit file and a copy of this deletion request should be sent to me immediately.

You must contact me in writing and request an extension in the event that you need more than thirty (30) days to verify and validate the debt. Failure to do so confirms that the time limit is reasonable.

**This notice also constitutes a Notice to Cease Telephonic Communications.** Non-compliance with this request will violate the **Telephone Consumer Protection Act 47 USC § 227.**

### NOTICE
THIS IS NOT A REQUEST FOR CONFIRMATION THAT YOU HAVE A COPY OF AN AGREEMENT OR COPIES OF STATEMENTS. I DEMAND PROOF THAT YOU HAVE THE REQUISITE KNOWLEDGE OF THE FACTS, AND THAT THE ALLEGED CREDITOR PROVIDED ADEQUATE CONSIDERATION AND INCURRED A FINANCIAL LOSS UNDER THE FULL & COMPLETE ORIGINAL AGREEMENT.

**Notice to the Principal is Notice to the Agent, and Notice to the Agent is Notice to the Principal.**

Thank you very much and best regards.

Sincerely,

Signed without prejudice by                    Myung Jin Myra Kozlowski

**P.S.** Please be aware that dependent upon your response, I may be detailing any potential issues with your company via an online public press release, including documentation of any potential small claims action.

Cc:

1. Equifax
   Attention: Richard F. Smith / Chairman and CEO
   P.O. Box 740241, Atlanta GA 30374

2. Equifax Information Services LLC
   P.O. Box 740256, Atlanta GA 30374

3. Experian Corporate Headquarters
   Attention: Don Robert / Chairman
   475 Anton Blvd., Costa Mesa CA 92626

4. Experian Corporate Headquarters
   Attention: Don Robert / Chairman
   955 American Lane, Schaumburg IL 60173

5. Experian Disputes Office
   P.O. Box 4500, Allen TX 75013

6. TransUnion
   Attention: James M. Peck / CEO & President
   555 W. Adams Street, Chicago IL 60661

7. TransUnion Consumer Solutions
   P.O. Box 2000, Chester PA 19022-2000

8. Consumer Financial Protection Bureau
   Attention: Enforcement Division
   1700 G Street NW, Washington DC 20552

9. Federal Trade Commission
   Attention: Bureau of Consumer Protection
   600 Pennsylvania Avenue NW, Washington DC 20580

# AFFIDAVIT: VERIFICATION OF DEBT

The undersigned affiant, being duly sworn, deposes and states:

1.     That I have the requisite knowledge of the facts regarding "Bank of America Account Number  4400669930834064" including the credit card agreement, account ledgers and bookkeeping entries;

2.     That Bank of America does not follow Generally Accepted Accounting Principles (GAAP) or the Federal Reserve Bank's policies and procedures, and did not create credits from the Cardholder's signed receipts, promises to pay, notes, or other instruments;

3.     That Bank of America used its own money, money equivalent, credit or capital, or that of other depositors, as adequate consideration to purchase the loan agreement and notes from the Cardholder;

4.     That Bank of America did not accept, receive or deposit any money, money equivalent, note, credit or capital from the Cardholder to fund a note, check or similar instrument that was used to finance/fund the charges on the alleged account;

5.     That Bank of America incurred financial losses and has been damaged in the amount of $ _____, and is attempting to collect a bona fide debt arising from services provided and/or goods sold to the Cardholder;

6.  When accounts are 90 days or more overdue, Bank of America does not receive a payoff of the amount due from insurance, whose premiums were unknowingly funded by the so-called "borrower".

7.  That all material facts and terms and conditions regarding the alleged account, have been disclosed to the Cardholder in the credit card agreement and promissory note;

8.  That Bank of America is the holder in due course of all notes and that the notes were taken for value, in good faith, and without any notice of claims or defenses, and that any transfer of the account was made with the full knowledge and consent of all the parties; and

9.  That I have personal knowledge that the Credit Card agreement and promissory notes were not altered or forged in any way.

## ATTESTATION

The facts stated above are true, correct and complete.

Signed by:                          Subscribed and Sworn before me this_____
                                    Day of_____, 2_____ .

_____    The State of_____

                                    County of_____

_____
Print Name  & Title

                                    _____
                                    Signature & Seal of Notary

Exhibit C



PO Box 9701
Allen, TX 75013

0009787 02 M8 0.420 **AUTO  6 0 7087 93311-282716  C02-P09796-I
MYUNG JIN-MYRA KOZLOWSKI
3816 VISTA DE LAGO CT
BAKERSFIELD CA 93311-2827

## Dispute Results

Our reinvestigation of the dispute you recently submitted is now complete. If we were able to make changes to your credit report based on information you provided, we have done so. Otherwise, we have contacted the company reporting the information you disputed, supplied them all relevant information and any documents you gave us with your dispute, and instructed them to review all information we provide them about your dispute, verify the accuracy of the information, provide us a response to your dispute, and update their records and systems as necessary.

Here are the results. If an item you disputed is not in the list of results below, it was either not appearing in your credit file or it already reflected the requested status at the time of our reinvestigation. If an item says "Deleted," we have

removed it from your credit report and taken steps so it does not reappear. If an item says "Remains," it means the company that reports the information to us has certified it is reported accurately. If an item says "Updated," your results may also indicate whether the information you disputed was updated; that information about the item, unrelated to your dispute (such as a balance or date) may have been updated; or whether the information unrelated to your dispute has been verified as accurate but other information unrelated to your dispute was updated (such as a balance or date). The current status of the item is included with your results; and you should look at the item carefully to see whether you believe it is now accurate.

If our reinvestigation has not resolved your dispute, you have several options:

– You may add a statement of up to 100 words to your report. If you provide a consumer statement that contains medical information related to service providers or medical procedures, then you expressly consent to Experian including this information in every credit report we issue about you.

– You may contact the company that reports the information to us and dispute it directly with them. If you wish to obtain documentation or written verification concerning your accounts, please contact your creditors directly.

– You may provide us additional information or documents about your dispute to help us resolve it by visiting www.experian.com/upload. You may also mail your information to Experian, P.O. Box 9701, Allen, Texas 75013.

– You may file a complaint about Experian or the company reporting the item, with the Consumer Financial Protection Bureau or your State Attorney General's office.

If there has been a change to your credit history resulting from our reinvestigation, or if you add a consumer statement, you may request that Experian send an updated report to those who received your report within the last two years for employment purposes, or within the last six months for any other purpose (the past 12 months for residents of Colorado, Maryland or New York). If you send a request to have your results sent to past recipients of your credit report, please designate the organization's name and address. In the event an organization is not specifically designated, we will generally default to sending only to companies that have requested your credit information as a result of an action you took, such as applying for credit, insurance, employment or apartment rental.

009966719



# experian™

If interested, you may also request a description of how the reinvestigation was conducted along with the business name, address and telephone number (if reasonably available) of the furnisher of information.

Thank you for helping ensure the accuracy of your credit information.

For frequently asked questions about your credit report, please visit experian.com/consumerfaqs.

If no information follows, our response appeared on the previous page.

By law, we cannot disclose certain medical information (relating to physical, mental, or behavioral health or condition). Although we do not generally collect such information, it could appear in the name of a data furnisher (e.g. "Cancer Center") that reports your payment history to us. If so, those names display on your report, but on reports to others, they display only as MEDICAL PAYMENT DATA. Consumer statements included on your report at your request that contain medical information are disclosed to others.

## Results

We have completed the processing of your dispute(s). Here are the results:

## Credit items

BK OF AMER 440066989083......
Outcome: Updated - Information on this item has been updated. Please review your report for the details.



P.O. Box 2000
Chester, PA 19016-2000



 

TransUnion.

# Exhibit C

MDG2013 00000394 01 6UT8H2
MYRA KOZLOWSKI
3816 VISTA DE LAGO CT
BAKERSFIELD, CA 93311-2827

Our investigation of the dispute you recently submitted is now complete. If we were able to make changes to your credit report based on information you provided, we have done so. Otherwise, we have contacted the company reporting the information you disputed, supplied them all relevant information and any documents you gave us with your dispute, and instructed them to: review all information we provide them about your dispute; verify the accuracy of the information; provide us a response to your dispute; and update their records and systems as necessary.

Please follow the 'How to read your results' section on the next page to help guide you in understanding the results of our investigation. If our investigation has not resolved your dispute, you have several options:

- You may add a 100-word statement to your report. If you provide a consumer statement that contains medical information related to service providers or medical procedures, then you expressly consent to TransUnion including this information in every credit report we issue about you.

- You may contact the company that reports the information to us and dispute it directly with them. If you wish to obtain documentation or written verification concerning your accounts, please contact your creditors directly.

- You may provide us additional information or documents about your dispute to help us resolve it by visiting www.transunion.com/dispute and indicating you are filing a repeat dispute. You will be prompted to add additional information you feel is relevant to your dispute as well as upload supporting documentation.

- You may file a complaint about TransUnion, or the company reporting the item, with the Consumer Financial Protection Bureau or your State Attorney General's office.

If there has been a change to your credit history resulting from our investigation, or if you add a consumer statement, you may request that TransUnion send an updated report to those who received your report within the last two years for employment purposes, or within the last six months for any other purpose.

If interested, you may also request a more detailed description of how the investigation was conducted along with the business name, address and telephone number of the source of information.

For frequently asked questions about your credit report, please visit http://transunion.com/consumerfaqs.



nnnnnn 01 05 000394 001634P

## How to read your results

The results of our investigation of your dispute consists of two sections: 1) the Investigation Results Summary which appears below, and 2) the attached view of how the disputed item(s) that remain on your credit report now appear(s). If an item you disputed is not listed, it means that the item was not appearing in your credit report or it already reflected the requested status at the time of our investigation. Items deleted from your credit report will not appear in the attached credit report detail and if no credit report detail is attached following the Investigation Results summary, you may view a free full copy of your credit report by visiting www.transunion.com/fullreport.

The following key provides you a more complete description of our investigation results of the items you disputed:

**DELETED:** The disputed item was removed from your credit report.

**DISPUTE NOT SPECIFIC; VERIFIED AND UPDATED:** The item was verified as belonging to you and other account information has changed or the item was updated to reflect recent activity.

**DISPUTED INFORMATION UPDATED:** A change was made to the item based on your dispute.

**DISPUTED INFORMATION UPDATED AND OTHER INFORMATION UPDATED:** A change was made to the item based on your dispute and other information unrelated to your dispute has changed.

**INFORMATION DELETED:** The item was removed from your credit report.

**INFORMATION UPDATED:** A change was made to the item.

**NO UPDATE NECESSARY:** The disputed information already reflects the requested status.

**REINSERTED:** This previously deleted item has now been verified; therefore, it has been reinserted into your credit report.

**VERIFIED AS ACCURATE:** The disputed information was verified as accurate and no change was made to the item.

**VERIFIED AS ACCURATE AND UPDATED:** The disputed information was verified as accurate; however, other information has changed and/or the item was updated to reflect recent activity.

## Investigation Results Summary

| ITEM | DESCRIPTION | RESULTS |
|------|-------------|---------|
| BANK OF AMERICA<br>PO BOX 982238<br>EL PASO, TX 79998-2235<br>(800) 421-2110 | # 440066993083**** | VERIFIED AS ACCURATE |

# Exhibit D

## Archived Reports    Bureau

Apr 21, 2017 - ...   ⌄   | **Experian®** | Equifax® | TransUnion® | Compare All |

Print My Experian Credit Report

Summary   **Accounts**   Collections   Inquiries   Public Records   Print Only This Page
🔒 Lock Your Credit Report

### View All Accounts                                   ◀ Previous   Next ▶

### BK OF AMER

**Details**

| | |
|---|---|
| Account # | **XXXX** |
| Original Creditor | - |
| Company Sold | - |
| Account Type | **Credit Card - Revolving Terms** |
| Date Opened | **Sep 1, 2015** |
| Account Status | **Open** |
| Payment Status | **Current** |
| Status Updated | **Apr 1, 2017** |
| Usage | **106%** |
| Balance | **$4,436** |
| Balance Updated | **Apr 4, 2017** |
| Credit Limit | **$4,200** |
| Monthly Payment | **$245** |
| Past Due Amount | - |
| Highest Balance | **$4,436** |
| Terms | **Revolving** |
| Responsibility | **Individual** |
| Your Statement | - |
| Comments | - |

*(no dispute reported)*

### Contact Information

PO BOX 982238 EL PASO, TX 79998 (800) 421-2110

Day 64

Exhibit D

| Archived Reports | Bureau |

| May 23, 2017 -... ∨ | Experian® | Equifax® | TransUnion® | Compare All |

Print My Experian Credit Report

Print Only This Page

Your Next Experian Credit Report is available in **23 days**.

Summary **Accounts** Collections Inquiries Public Records | 🔒 Lock Your Credit Report

**View All Accounts**  ◄ Previous  Next ►

**BK OF AMER**

**Details**

| Account # | **XXXX** |
| Original Creditor | - |
| Company Sold | - |
| Account Type | **Credit Card - Revolving Terms** |
| Date Opened | **Sep 1, 2015** |
| Account Status | **Open** |
| Payment Status | **Current** |
| Status Updated | **Apr 1, 2017** |
| Usage | **106%** |
| Balance | **$4,436** |
| Balance Updated | **Apr 4, 2017** |
| Credit Limit | **$4,200** |
| Monthly Payment | **$245** |
| Past Due Amount | - |
| Highest Balance | **$4,436** |
| Terms | **Revolving** |
| Responsibility | **Individual** |
| Your Statement | - |
| Comments | - |

(no dispute reported)

# Exhibit D

## Archived Reports

Apr 17, 2017 - ...  ∨

## Bureau

| Experian® | Equifax® | TransUnion® | Compare All |

TransUnion

Print My TransUnion Credit Report

Summary    Accounts    Collections    Inquiries    Print Only This Page    Records

## View All Accounts

## BK OF AMER

**Details**

| | |
|---|---|
| Account # | **XXXX** |
| Original Creditor | - |
| Company Sold | - |
| Account Type | **Revolving account** |
| Date Opened | **Sep 9, 2015** |
| Account Status | **Open** |
| Payment Status | **30 days past due** |
| Status Updated | **Apr 7, 2017** |
| Usage | **106%** |
| Balance | **$4,436** |
| Balance Updated | **Apr 7, 2017** |
| Credit Limit | **$4,200** |
| Monthly Payment | **$153** |
| Past Due Amount | **$245** |
| Highest Balance | **$4,436** |
| Terms | **Minimum** |
| Responsibility | **Individual account** |
| Your Statement | - |
| Comments | - |

◀ Previous    Next ▶

(no dispute reported)

## Contact Information

PO BOX 982238 EL PASO, TX 79998 (800) 421-2110

Exhibit D

**Archived Reports**

**Bureau**

May 23, 2017 -...  ⌄

| Experian® | Equifax® | TransUnion® | Compare All | 🖶 |

Print My TransUnion Credit Report

Summary     **Accounts**     Collections     Inquiries   Print Only This Page   Public Records

## View All Accounts

◀ **Previous**   **Next** ▶

### BK OF AMER

**Details**

| | |
|---|---|
| Account # | **XXXX** |
| Original Creditor | - |
| Company Sold | - |
| Account Type | **Revolving account** |
| Date Opened | **Sep 9, 2015** |
| Account Status | **Closed** |
| Payment Status | **60 days past due** |
| Status Updated | **May 1, 2017** |
| Usage | **108%** |
| Balance | **$4,545** |
| Balance Updated | **May 1, 2017** |
| Credit Limit | **$4,200** |
| Monthly Payment | **$551** |
| Past Due Amount | **$398** |
| Highest Balance | **$4,545** |
| Terms | **Minimum** |
| Responsibility | **Individual account** |
| Your Statement | - |
| Comments | - |

(no dispute reported)

### Contact Information

PO BOX 982238 EL PASO, TX 79998 (800) 421-2110

Exhibit E

# Record of requests for your credit history

We make your credit history available to your current and prospective creditors and employers as allowed by law. Experian may list these inquiries for up to two years.

## Inquiries shared with others

The section below lists companies that have requested your credit information as a result of an action you took, such as applying for credit or financing or as a result of a collection. The inquiries in this section are shared with companies that receive your credit history.

Examples of inquiries shared with others include:
- a real estate loan
- a home mortgage loan
- an auto loan
- an application for credit

**CREDIT ONE BANK** PO BOX 98875  LAS VEGAS NV 89193 (877) 825 3242
**Address identification number:** 0551733545
**Date** Jan 29, 2017 **Reason** Unspecified. This inquiry is scheduled to continue on record until Feb 2019.

**CITI CARDS/CITIBANK** PO BOX 6000  SIOUX FALLS SD 57117 (888) 766 2484
**Address identification number:** 0551733545
**Date** Nov 8, 2016 **Reason** Unspecified. This inquiry is scheduled to continue on record until Dec 2018.

**CHASE CARD** PO BOX 15298  WILMINGTON DE 19850 (800) 432 3117
**Address identification number:** 0188341179
**Date** Oct 20, 2016 **Reason** Unspecified. This inquiry is scheduled to continue on record until Nov 2018.

**WF CRD SVC** PO BOX 14517  DES MOINES IA 50306 (800) 642 4720
**Address identification number:** 0821392876
**Date** Oct 17, 2016 **Reason** Unspecified. This inquiry is scheduled to continue on record until Nov 2018.

## Inquiries shared only with you

You may not have initiated the following inquiries, so you may not recognize each source. We report these requests to you only as a record of activities, and **we do not include any of these requests on credit reports to others.**

We offer credit information about you to those with a permissible purpose, such as:
- other creditors who want to offer you preapproved credit;
- an employer who wishes to extend an offer of employment;
- a potential investor in assessing the risk of a current obligation;
- Experian Consumer Assistance to process a report for you;
- your current creditors to monitor your accounts (date listed may reflect only the most recent request);
- an end user to complete your mortgage loan application;
- insurance underwriting (auto or home).

These inquiries DO NOT affect your credit score and are not seen by anyone but you (except insurance companies may able to see other insurance company inquiries).

**CIC EXPERIAN CREDITWORKS** 535 ANTON BLVD STE 100  COSTA MESA CA 92626 (866) 431 3471
**Date of inquiry:** Feb 18, 2018; Feb 06, 2018; Feb 04, 2018; Jan 21, 2018; Jan 07, 2018; Jan 06, 2018; Dec 24, 2017; Dec 10, 2017; Nov 26, 2017; Nov 12, 2017; Nov 07, 2017; Oct 29, 2017; Oct 15, 2017; Oct 01, 2017; Sep 17, 2017; Sep 03, 2017; Aug 20, 2017; Aug 09, 2017; Aug 06, 2017; Jul 18, 2017; Jul 13, 2017; Jul 12, 2017; Jul 09, 2017; Jul 04, 2017; Jun 30, 2017; Jun 27, 2017; Jun 24, 2017; Jun 20, 2017; Jun 06, 2017; May 27, 2017; May 26, 2017; May 24, 2017; May 23, 2017; May 15, 2017; May 08, 2017; May 03, 2017; May 01, 2017; Apr 24, 2017; Apr 21, 2017; Apr 17, 2017; Apr 16, 2017; Apr 14, 2017; Apr 13, 2017; Apr 10, 2017; Apr 09, 2017; Apr 04, 2017; Mar 31, 2017; Mar 27, 2017; Mar 26, 2017; Mar 24, 2017; Mar 21, 2017; Mar 18, 2017; Mar 17, 2017; Feb 09, 2017; Jan 29, 2017; Nov 26, 2016; Oct 29, 2016; Sep 24, 2016

**AMERICAN EXPRESS 2** PO BOX 981537  EL PASO TX 79998 (800) 874 2717
**Date of inquiry:** Feb 08, 2018

**ECS/RIGHT OFFER MARKETPL** 475 ANTON BLVD  COSTA MESA CA 92626 **No phone number available**
**Date of inquiry:** Feb 06, 2018; Jan 24, 2018; Jan 23, 2018; Jan 18, 2018; Jan 13, 2018; Jan 08, 2018; Jan 06, 2018; Nov 07, 2017; Aug 09, 2017; Jul 13, 2017; Jul 12, 2017; Jun 30, 2017; Jun 27, 2017; Jun 24, 2017; May 27, 2017; May 26, 2017; May 24, 2017; May 23, 2017; May 08, 2017; May 03, 2017; Apr 24, 2017; Apr 21, 2017; Apr 17, 2017; Apr 16, 2017; Apr 13, 2017; Apr 10, 2017; Apr 09, 2017; Apr 04, 2017; Mar 27, 2017; Mar 26, 2017; Mar 24, 2017; Mar 21, 2017; Mar 18, 2017; Mar 17, 2017; Feb 11, 2017; Feb 09, 2017; Jan 29, 2017; Nov 27, 2016

**CONSUMERINFO.COM INC** PO BOX 19729  IRVINE CA 92623 **No phone number available**
**Date of inquiry:** Feb 05, 2018; Oct 10, 2017; Oct 09, 2017; Oct 03, 2017; Sep 09, 2017; Aug 22, 2017; Aug 09, 2017; Aug 03, 2017; Jul 09, 2017; Jul 08, 2017; Jul 01, 2017; Jun 24, 2017; Jun 19, 2017; Jun 14, 2017; Jun 09, 2017; May 15, 2017; May 01, 2017; Apr 15, 2017; Apr 09, 2017; Apr 08, 2017; Feb 08, 2017; Jan 21, 2017; Nov 26, 2016; Nov 11, 2016; Nov 10, 2016; Nov 08, 2016; Nov 07, 2016; Oct 20, 2016; Oct 17, 2016; Oct 10, 2016; Sep 25, 2016

**CHASE CARD** PO BOX 15298  WILMINGTON DE 19850 (800) 432 3117
**Date of inquiry:** Jan 23, 2018; Apr 25, 2016; Apr 04, 2016; Feb 04, 2016

**THE MOORE LAW GROUP** 3710 S SUSAN ST STE 210  SANTA ANA CA 92704 (714) 431 2000
**Date of inquiry:** Jan 23, 2018; Jan 08, 2018; Dec 27, 2017; Dec 26, 2017; Nov 22, 2017; Oct 25, 2017; Oct 11, 2017

**EXPERIAN** PO BOX 9600  ALLEN TX 75013 (800) 311 4769
**Date of inquiry:** Jan 13, 2018; Feb 09, 2017

**KERN SCHOOLS FCU** 11500 BOLTHOUSE DR  BAKERSFIELD CA 93311 (661) 833 7816
**Date of inquiry:** Dec 27, 2017

**THE MOORE LAW GROUP** 3710 S SUSAN ST STE 210  SANTA ANA CA 92704 (714) 431 2000
**Date of inquiry:** Oct 11, 2017

**CHASE CARD** PO BOX 15298  WILMINGTON DE 19850 **No phone number available**
**Date of inquiry:** Oct 03, 2017

**WF CRD SVC** PO BOX 14517  DES MOINES IA 50306 (800) 642 4720
**Date of inquiry:** Sep 05, 2017

**BILTMORE ASSET MANAGEMEN** 24500 CENTER RIDGE RD STE 472  WESTLAKE OH 44145 (440) 249 0038
**Date of inquiry:** Jul 05, 2017

  Exhibit F 

Home > Regulation & Examinations > Bank Examinations > Credit Card Securitization Manual

## Credit Card Securitization Manual

Manual Home
Chapter II. – The Securitization Transaction (Overview)

Introduction

Basic Set-up

The Purpose of SPE and QSPE Master Trusts

The Transaction

Seller's Interest

Cash Flows and Structures

Credit Enhancements

Rating Agencies

Changing Structures

## II THE SECURITIZATION TRANSACTION (Overview)

### INTRODUCTION

This chapter provides a basic overview of credit card securitizations. Subsequent chapters go into more detail on the various concepts discussed here. Asset-backed securities (ABS) are bonds backed by financial assets, such as auto loans, mobile home loans, credit card loans, and student loans. In the case of credit card ABS, the bonds (referred to as certificates or ABS in this document) are backed by credit card receivables. While the process of securitizing loans has been around for over 30 years, the securitization of credit card receivables first began in 1987. Since then, the process and structure have evolved significantly, and credit card securitizations currently represent the primary funding vehicle for unsecured revolving consumer credit. Similar to mortgage and other asset securitizations, the financial institution that originates the credit card receivables sells a group of these receivables to a trust. The trust then creates and sells certificates backed by the credit card receivables to investors, which are predominately institutional investors. Very few credit card ABS are marketed to retail customers, primarily due to the complex nature of the transactions and the need to continually monitor various performance indices on the underlying receivables. The underlying credit card receivables generate income to support the interest payments on the certificates.

back to top

### BASIC SET-UP

Exhibit A depicts a basic set-up for a securitization. The securitization is created when the financial institution (originator/transferor/seller/sponsor) has accumulated a significant volume of credit card receivables (originated or purchased) and transfers these receivables to a wholly-owned bankruptcy remote Special Purpose Entity (SPE), which then transfers the receivables to a securitization vehicle (typically a QSPE trust). The trust then packages the receivables and issues investor certificates (sold to investors) and trust certificates (retained by the transferor or affiliate). Proceeds from the sale of the investor certificates go to the trust. The trust in turn pays the financial institution (seller) for the purchase of the underlying credit card receivables. The investor certificates noted in Exhibit A are typically issued with a senior/subordinated structure. The seller/originator often retains the bottom or most subordinated piece or pieces. The trust certificates are also referred to as transferor's interest, seller's certificate, or seller's interest.

Exhibit A



Rather than setting up a new trust for each securitization issued, most credit card companies use a single master trust for multiple issues, as illustrated in Exhibit B. A master trust is set up to allow for receivables to be added to the trust over time and to issue multiple "series" of certificates identified by specific issue dates all backed by a single pool of credit card receivables in the master trust. The cash flow generated from all of the receivables in the master trust is used to fund debt service payments on each series. As such, each series has an undivided interest in the receivables in the master trust.[2]

Exhibit B



## The purpose of SPE and QSPE Master Trusts

SPEs and QSPE Master Trusts are established to isolate transferred financial assets beyond the reach of the transferor and its creditors, even in the event of a bankruptcy of the transferor. In order for the transaction to be treated as a sale, the transferor must surrender control over the assets transferred and receive consideration or compensation for the transferred assets. Control is considered to be surrendered only if all of the following three conditions are met:[3]

- The assets have been legally isolated.
- The transferee has the ability to pledge or exchange the assets
- The transferor otherwise no longer maintains effective control over the assets.

These control requirements are discussed in greater detail in the Accounting Chapter. In addition, the FDIC adopted a *Final Rule on the Treatment of Securitizations and Participations Following the FDIC's Appointment as Conservator or Receiver* (FIL-57-2000), which directly relates to the "legal isolation" concept. Examiners can review this document to gain a greater insight into the FDIC's position regarding this isolation test.

back to top

## THE TRANSACTION

In a credit card securitization transaction only the receivables are sold, not the accounts that generate the receivables. The financial institution retains legal ownership of the credit card accounts and can continue to change the terms on the accounts. Accounts corresponding to securitized loans are typically referred to as the designated accounts (or sometimes trust accounts). The initial outstanding balances on the designated accounts are sold to the trust as are the rights to any new charges on the designated accounts. Subsequently, as cardholder purchase activity generates more receivables on the designated accounts, these new receivables are purchased by the trust from the originating institution/seller/transferor. The trust uses the monthly principal payments received from the cardholders to acquire these new charges or receivables. When the securitization is initially set up, the originating institution/seller adds sufficient receivables to support the principal balance of the certificates plus an additional amount (seller's interest) that serves to absorb fluctuations in the outstanding balance of the receivables. The originating institution/seller will make subsequent additions to the trust in order to keep the seller's interest at the required level.

back to top

## SELLER'S INTEREST

The seller's interest, also referred to as transferor's certificates or seller's certificates, represents ownership interest in the trust assets that have not been allocated to any investor certificate holders' interest. Seller's interest represents credit card receivables transferred to the securitization vehicle but not pledged to back any specific certificates. As a result, the relationship between the seller's interest and the investor certificates is pari passu, meaning the holders of the investor certificates and the holder of the seller's interest have the same priority on claims on the underlying collateral. The size of the seller's interest is determined by the rating agencies and serves two primary purposes. First, it absorbs fluctuations in the outstanding principal balances of the designated accounts. Since investor certificates are issued in fixed principal amounts, the seller's interest exists to ensure that there will be sufficient collateral available to support the investor certificates, particularly since cardholder seasonal spending patterns cause balances to fluctuate, and in some months principal payments may exceed new charges on the cards. Second, it is available to ensure sufficient receivables exist following non-cash deductions in balances (dilution) due to charge reversals, such as merchandise returns, disputes, and fraudulent charges. Charge-offs are typically shared pro-rata between the seller's interest and the investors' certificates.[1]

The seller's interest is not always "certificated" as the terms seller's certificate or transferor's certificate often imply. In the past, institutions have stated that since the seller's interest represents seller's certificates it should be carried in the investment portfolio versus the loan portfolio; thereby, eliminating the need for an allowance for loan and lease losses (ALLL) against the seller's interest. However, the seller's interest piece does not represent a sale or financing since no proceeds were received for the transferred assets. Instead, the seller received an interest in the transferred assets and this interest should be reflected in the loan category on the financial institution's books.

back to top

## CASH FLOWS AND STRUCTURES

Credit card securitizations differ from other ABS since the underlying credit card receivables have a relatively short life, typically eight to ten months, supporting the outstanding certificates, which typically have three, five, or ten year maturities. As a result of this maturity mismatch, each series issued out of the master trust is structured to have a revolving period and a controlled amortization period or controlled accumulation period. During the revolving period, the cardholders make monthly principal and interest payments to the servicer. The servicer deposits the payments into two separate collections accounts, one for principal and one for finance charges. The trust expenses are paid, including interest payments on the investors' certificates, from the finance charge account. New receivables generated by the designated accounts are purchased from the originating institution/seller with funds from the principal account.

The revolving period is for a predetermined period of time that is established at the time the series (often referred to as the "deal") is structured. Following the revolving period, there is a controlled amortization or accumulation period. During the controlled amortization period, the principal collections are used to pay down the outstanding principal amount of the investor certificates. During controlled accumulation, the principal payments collected are deposited into a trust account and reinvested in short-term investments. These short-term investments become the collateral for the outstanding investor certificates and increase as principal payments are received from the cardholders until the investments equal the amount of the outstanding investor certificates in the maturing series. The investments mature at the same time allowing the trustee to make a bullet payment to all the investment certificate holders. Most credit card ABS are structured using controlled accumulation and bullet payments.

Since the designated pool of accounts remains part of the trust, the seller's interest grows during the amortization or accumulation phase. This is what is meant by the commonly used phrase "receivables come back on the books." The financial institution or seller does not actually bring the previously sold receivables on the books when the investor certificates mature or during the accumulation period. Instead, as noted, the principal payments received on the sold receivables are accumulated (invested) and ultimately used to payoff the outstanding investor certificates, while the new charges incurred on the designated accounts during the accumulation period become seller's interest since they are no longer collateral for the investor certificates and as such are reported as loans on the bank's books.

## CREDIT ENHANCEMENTS

Credit enhancements are required in order to receive higher debt ratings and thus improve marketability and financing costs. Credit enhancements can be either internal or external or a combination of both. The most common external credit enhancements facilities are cash collateral accounts, collateral invested amounts (CIA), third-party letters of credit, and reserve accounts. The most common internal credit enhancements facilities are senior/subordinated certificates, excess finance charges, spread accounts and over collateralization. These items are discussed in more detail in the Credit Enhancement Chapter.

## RATING AGENCIES

Credit rating agencies play a large role in credit card securitizations. The rating agencies determine the amount of credit enhancements required for specific credit ratings, the amount of seller's interest, and account eligibility. The seller can only designate accounts that meet transaction account eligibility requirements as dictated by the rating agencies. Since all series in a master trust benefit from their pro-rata undivided interest in a single pool of credit card receivables, the rating agencies perform their credit analysis on all of the credit card receivables in the master trust for each series issued. Since credit card issuers can add receivables to the trust and change the terms on existing receivables, the credit risk of the underlying collateral in the master trust can change over time. The rating agencies continually monitor the performance of the receivables in trust.

Credit card ABS performance has been very good since these products were first introduced in the late 1980s. A major factor in the favorable performance is because the rating agencies rigorously stress test the various components on the underlying receivables when determining the credit enhancement requirements for each structure. For the highest rating band (triple-A), rating agencies generally stress the assumptions to simulate a negative excess spread and early amortization environment. Credit enhancements are then determined to ensure that the triple-A holders would receive timely and ultimate interest and principal payments even in these highly-stressed scenarios. Lower-rated classes are stress tested under less severe scenarios. For issues that carry a floating-rate coupon on the investor certificates, the rating agencies stress the underlying index to reflect an increased coupon rate.[5]

## CHANGING STRUCTURES

Credit card securitization structures have evolved to satisfy accounting and tax issues, Security and Exchange Commission (SEC) requirements, and rating agency criteria. Many of these changes are also occurring as banks are motivated to achieve greater funding efficiencies and availabilities. Changes continue today and will certainly continue into the future. For example, several issuers now use a de-linked securitization structure. Under this structure, an issuer could sell a subordinated class, commonly the Class C (triple-B rated notes), prior to the issuance or offering of any more highly-rated classes. This structure gives the bank enhanced market liquidity since conceptually it will be easier for the trust to issue and sell higher-rated classes than lower-rated classes when the need arises. While the market for credit card Class C certificates has been around since the mid-1990s, all classes in a particular series were typically offered at the same time. The evolution of the credit card securitization structure, particularly the concept of a de-linked structure, is greatly expanding the Class C market, creating enhanced market and funding opportunities. With this de-linked structure, issuers are also offering subordinated classes at amounts that exceed the credit enhancement requirements that would be imposed if each Class A certificate was issued with the exact required amount of subordinated classes. As a result, for some issuers, the amount of aggregate outstanding subordinated classes supports the issuance of additional senior classes, creating the opportunity for quick funding access in the senior class market if needed.[6]

Many financial institutions are issuing credit card ABS via complex structures. Bank One created its Bank One Issuance Trust in 2002. That trust accommodates the issuance of certificates on either a stand-alone basis, multiple series basis, or on a de-linked basis out of a single series, and also allows for the creation and subsequent issuance of certificates out of multiple asset pools. Financial institutions are also using collateral certificates, which allow the issuer to have some receivable and cash flow sharing between master trusts, such as when one financial institution acquires another institution that had its own credit card receivables and master trust. In addition, instead of issuing certificates that are fixed as to principal, credit card companies are issuing Variable Funding Certificates with provide for monthly principal settlement, which may increase or decrease the outstanding amount of the principal. This type of structure allows the banks to more efficiently respond to the seasonal fluctuations in funding requirements. As a result of banks' continuing incentive to improve funding access, efficiency, and costs, examiners need to stay abreast of the changing nature of credit card securitization structures.

---

[3] Bernstein Research, "*Credit Card Securitization: A Quick Primer*," May 2002.

[3] Financial Accounting Standards Board, "*Statement of Financial Accounting Standards No. 140, Accounting for the Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.*" September 2000.

[4] Deutsche Bank, "*The Essential Guide to Credit Card As, Bs, and Cs.*" January 2001.

[5] Ibid

[6] Ibid

Last Updated 05/24/2007

# Credit Card Agreement


**Bank of America**

## for MYUNGJIN MYRA KOZLOWSKI

**EXHIBIT G**

This Agreement is for your credit card account with us. It applies to you and all authorized users.

In addition to the features outlined in this Agreement, you may be offered other benefits, which will be governed by separate agreements.

### TABLE OF CONTENTS

ACCOUNT SUMMARY TABLE ........................................................................ 2
YOUR CONTRACT WITH US .......................................................................... 5
TYPES OF TRANSACTIONS ........................................................................... 5
INTEREST AND FEES ................................................................................... 6
PAYMENTS AND DEFAULT ............................................................................ 9
CREDIT AVAILABILITY ................................................................................ 11
LIMITATIONS/WARNINGS ........................................................................... 12
MISCELLANEOUS ...................................................................................... 12
YOUR BILLING RIGHTS .............................................................................. 14

1

## ACCOUNT SUMMARY TABLE

As required by law, rates, fees, and other costs of this credit card account are disclosed here. All account terms are governed by the Credit Card Agreement. Account and Agreement terms are not guaranteed for any period of time; all terms, including fees and the APRs, may change in accordance with the Agreement and applicable law. The reasons we may change these terms include the following: a change in regulation or legislation, or a change in the interpretation of a regulation or legislation, your risk profile based on your payment patterns, transaction patterns, balance patterns, and utilization levels of this and other accounts, credit bureau information including the age, history and type of other accounts, and relationships between each and all of these measures of risk. We may also change terms for reasons not related to your individual credit history, such as overall economic and market trends, product design, and business needs.

## Interest Rates and Interest Charges

| | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **0.00%** Introductory APR through your statement Closing Date in January 2017 on Purchases bearing this Introductory Offer ID. Introductory Offer ID Y297-AA8Y9<br><br>After that, your APR for the Purchase introductory balances will be **18.99%**. This APR will vary with the market based on the Prime Rate. For any other Purchase transactions not subject to an introductory APR, your APR will be **18.99%**. This APR will vary with the market based on the Prime Rate. |
| **APR for Balance Transfers** | **0.00%** Introductory APR through your statement Closing Date in January 2017 on Balance Transfers bearing this Introductory Offer ID posting by November 8, 2015. Introductory Offer ID Y297-AA9Y9<br><br>After that, your APR for the Balance Transfer introductory balances will be **18.99%**. This APR will vary with the market based on the Prime Rate. For any other Balance Transfer transactions not subject to an introductory APR, your APR will be **18.99%**. This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | |
| • **Direct Deposit and Check Cash Advances** | **21.99%**, This APR will vary with the market based on the Prime Rate. |
| • **Bank Cash Advances** | **24.99%**, This APR will vary with the market based on the Prime Rate. |
| **Penalty APR and When It Applies** | Up to **29.99%**, based on your creditworthiness. This APR will vary with the market based on the Prime Rate.<br><br>This APR may be applied to new transactions on your account if you: |

SEE BACK OF PAGE for more important information about your account.

2

|  | **How Long Will the Penalty APR apply?:** If your APR is increased for this reason, the Penalty APR will apply indefinitely. |
|---|---|
| **Paying Interest** | Your due date is at least 25 days after the close of each billing cycle. We will not charge you any interest on purchases if you pay your entire balance by the due date each month. We will begin charging interest on cash advances and balance transfers on the transaction date. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than $1.50. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at  http://www.consumerfinance.gov/learnmore. |

## Fees

### Transaction Fees

- Balance Transfer — 3.00% of the amount of each transaction (Fee: Min. $10.00)

- Cash Advance
  - ATM Cash Advance — 5.00% of the amount of each transaction (Fee: Min. $10.00)
  - Cash Equivalent — 5.00% of the amount of each transaction (Fee: Min. $10.00)
  - Check Cash Advance — 3.00% of the amount of each transaction (Fee: Min. $10.00)
  - Direct Deposit — 3.00% of the amount of each transaction (Fee: Min. $10.00)
  - Overdraft Protection — $10.00 for each transaction
  - Over the Counter Cash Advance — 5.00% of the amount of each transaction (Fee: Min. $10.00)
  - Same-Day Online Cash Advance — 5.00% of the amount of each transaction (Fee: Min. $10.00)

- Foreign Transaction — 3.00% of the amount of each transaction

- Wire Transfer Purchase — 5.00% of the amount of each transaction (Fee: Min. $10.00)

### Penalty Fees

- Late Payment — Up to $35

| • Returned Payment | Up to **$25** |

**How We Will Calculate Your Balance:** For Purchase balances, we will use a method called "average daily balance (including new Purchases)." See the section titled *Balances Subject to Interest Rate* in your Credit Card Agreement for more details.

For Balance Transfer and Cash Advance balances, we will use an Average Balance Method (including new Balance Transfers and Cash Advances): This balance is figured by adding the outstanding balance (including new Balance Transfers and Cash Advances and deducting payments and credits) for each day in the current billing cycle, together with the balances for each day in the previous billing cycle for balance transfers and cash advances with transaction dates in the previous cycle and posting dates in the current cycle, and then dividing by the number of days in the current billing cycle.

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided in your Credit Card Agreement.

# CREDIT CARD AGREEMENT

## YOUR CONTRACT WITH US

This document, and any future changes to it, is your contract with us. We will refer to this document as your "Agreement" or "Credit Card Agreement"; these terms also include any changes we may make to this document from time to time.

**We reserve the right to amend this Agreement at any time** by adding, deleting, or changing provisions of this Agreement. All amendments will comply with the applicable notice requirements of federal and North Carolina law that are in effect at that time.

If an amendment gives you the opportunity to reject the change, and if you reject the change in the manner provided in such amendment, we may terminate your right to receive credit and may ask you to return all credit devices as a condition of your rejection. We may replace your card with another card at any time.

**The reasons we may amend this Agreement include the following:**

- Changes in regulation or legislation, or a change in the interpretation of a regulation or legislation.
- Changes related to your individual credit history, such as your risk profile, your payment or transaction patterns, balance patterns, the utilization levels of this and other accounts, credit bureau information including the age, history and type of other accounts, and the measure of risk associated with each.
- Changes to overall economic and market trends, product design, and business needs.

"We", "us", "our", means Bank of America, N.A., also known as FIA Card Services and referred to in future communications as FIA Card Services.

"You" and "your" mean, each and all of the persons who are granted, accept or use the account and any person who has guaranteed payment of the account.

You may use your account for personal, family, or household purposes. You may not use your account for business or commercial purposes.

Our failure or delay in exercising any of our rights under this Agreement does not mean that we are unable to exercise those rights later.

## TYPES OF TRANSACTIONS

You may obtain credit in the form of **Purchases, Balance Transfers,** and **Cash Advances,** by using cards, access checks, an account number, or other credit devices. Cards are all the credit cards we issue to you and to any other person with authorization for use on this account pursuant to this Agreement. An access check is a check we provide to you to obtain credit on this account. All access checks include an expiration date printed at the top. We will honor access checks received for payment before the expiration date, printed on the check, provided your account is open and in good standing, with available credit. Access checks without a printed expiration date will not be honored. So your card before using it.

**Purchase** means the use of your card or account number (including through the use of an enabled mobile device) to:

1. buy or lease goods or services;
2. buy wire transfers from a non-financial institution (Wire Transfer Purchase);
3. make a transaction that is not otherwise a Cash Advance.

Purchases include Account Fees, as well as Transaction Fees and adjustments associated with any Purchase.

**Balance Transfer** means a transfer of funds to another creditor initiated by us at your request. A Balance Transfer does not include a transaction that is otherwise a Cash Advance, except that any Direct Deposit completed at the time of your application for this account will be treated as a Balance Transfer. Balance Transfers include Transaction Fees and adjustments associated with any Balance Transfer.

A **Cash Advance** means the use of your account for a loan in the following ways:

1. **Direct Deposit:** by a transfer of funds via an ACH (Automated Clearing House) transaction to a deposit account initiated by us at your request. A Direct Deposit does not include an Overdraft Protection Cash Advance or a Same-Day Online Cash Advance.
2. **Check Cash Advance:** by an access check you sign as drawer.
3. **Bank Cash Advance:** by loans accessed in the following manner:
   a. **ATM Cash Advance:** at an automated teller machine;
   b. **Over the Counter ("OTC") Cash Advance:** at any financial institution (e.g., to obtain cash, money orders, wire transfers, or travelers checks); or at any non-financial institution (i.e., to obtain cash);
   c. **Same-Day Online Cash Advance:** by a same day online funds transfer to a deposit account.
   d. **Overdraft Protection Cash Advance:** by a transfer of funds to a deposit account pursuant to an overdraft protection program (see the section titled *Overdraft Protection* below);
   e. **Cash Equivalents:** by the purchase of foreign currency, money orders or travelers checks from a non-financial institution, or person-to-person money transfers, bets, lottery tickets purchased outside financial institution, or person-to-person money transfers.

5

the United States, casino gaming chips, or bail bonds with your card or account number (including through the use of an enabled mobile device).

Cash Advances include Transaction Fees and adjustments associated with any Cash Advance.

All Bank Cash Advances are subject to the Cash Credit Line. For more information on credit lines, please refer to the section titled *Your Credit Lines* within this Agreement.

## YOUR CREDIT CARD ACCOUNT AND YOUR MOBILE PHONE OR OTHER MOBILE DEVICES

Smart phones, some tablets or other mobile devices (a "mobile device") can download, store, and/or access account information, for instance through a mobile wallet, that may enable you to use the mobile device to purchase goods or services, make a balance transfer, or make a cash advance.

In certain instances, those transactions will replicate using your card to make a transaction on the internet with your computer. In other instances, the phone or mobile device will act as if it were a credit card itself. Applications that enable your mobile device will have unique terms governing those applications. Read them carefully. Transactions made through those applications are governed by this Agreement.

When your credit card account information is accessible by your mobile device, it is important that you treat your mobile device with the same care you would your credit card. For example, you should secure your mobile device against unauthorized access. Keep in mind, if you give someone your phone, or other mobile device, that can be the same as giving that person your credit card.

## TRANSACTIONS MADE IN FOREIGN CURRENCIES

If you make a transaction in a foreign currency (including, for example, online purchases from foreign merchants), the transaction will be converted by Visa International or MasterCard International, depending on which card is associated with this account, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time the transaction is processed. Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or posting date.

# INTEREST AND FEES

## INTEREST RATES - ANNUAL PERCENTAGE RATES (APRs)

This section provides the interest rates, also referred to as corresponding Annual Percentage Rates (APRs), which are applicable to your account. The APR corresponds to the Daily Periodic Rate (DPRs): the APR is equal to the DPR multiplied by 365, and the DPR is equal to the APR divided by 365. Interest charges are calculated by using the DPR. If a rate is a variable rate, we calculate that APR by adding together an index and a margin. For more information on variable rates, please refer to the *How to Calculate Variable Rates* section within this Agreement.

**Promotional Rates and Fees**

Promotional or Introductory Offers are temporary APRs (Promotional or Introductory Rates) or transaction fees (Promotional or Introductory Fees) that are offered on certain qualifying new transactions for a specified period of time. Each Offer will be assigned a unique Offer ID which will appear on your credit card statement after the first qualified new transaction for that Offer. If you revolve your balance to take advantage of a Promotional or Introductory Offer, all transactions and balances, including purchases, will be charged interest.

Your account has the following Introductory Offers:

**Purchases:**

Introductory Offer ID: **Y297-AA8Y9**

The Introductory APR is **0.00%** (0.000000% DPR).

This Introductory Offer applies to Purchases bearing this Introductory Offer ID (each is an "eligible transaction" for this Introductory Offer).

This Offer applies to eligible transactions posting to your account beginning September 9, 2015. This Introductory APR ends on your statement Closing Date in January 2017.

When this Introductory APR ends, the APR for these Purchase introductory balances will increase to a variable rate calculated using the variable rate formula with a margin of 15.74 percentage points; this currently results in an APR of **18.99%**.

**Balance Transfers:**

Introductory Offer ID: **Y297-AA9Y9**

The Introductory APR is **0.00%** (0.000000% DPR).

This Introductory Offer applies to Balance Transfers bearing this Introductory Offer ID (each is an "eligible transaction" for this Introductory Offer).

This Offer applies to eligible transactions posting to your account beginning September 9, 2015 through November 8, 2015. This Introductory APR ends on your statement Closing Date in January 2017.

When this Introductory APR ends, the APR for these Balance Transfer introductory balances will increase to a variable rate calculated using the variable rate formula with a margin of 15.74 percentage points; this currently results in an APR of 18.99%.

## Current Rates

Your current rate is the rate that will apply to transactions that are not subject to an Introductory or a Promotional Rate.

**Purchases:**

The APR for Purchases is a variable rate calculated using the variable rate formula with a margin of 15.74 percentage points; this currently results in an APR of 18.99% (0.052027% DPR).

**Balance Transfers:**

The APR for Balance Transfers is a variable rate calculated using the variable rate formula with a margin of 15.74 percentage points; this currently results in an APR of 18.99% (0.052027% DPR).

**Direct Deposit and Check Cash Advances:**

The APR for Direct Deposit and Check Cash Advances is a variable rate calculated using the variable rate formula with a margin of 18.74 percentage points; this currently results in an APR of 21.99% (0.060246% DPR).

**Bank Cash Advances:**

The APR for Bank Cash Advances is a variable rate calculated using the variable rate formula with a margin of 21.74 percentage points; this currently results in an APR of 24.99% (0.068465% DPR).

## Rates for Protected Balances

When an interest rate change for new transactions is applied to your account, any existing balances of that type will be identified as Protected Balances on your statement. These Protected Balances generally are kept at their current APR until the balances are paid in full.

Your account does not currently have any Protected Balances.

## PENALTY APR AND WHEN IT APPLIES

The Penalty APR is the APR(s) which may be applied to new Purchases, Balance Transfers, and Cash Advances, for certain default occurrences as described below.

We may increase the APRs on new transactions up to the Penalty APR, based on your creditworthiness, each time a Total Minimum Payment Due is not received by its applicable Payment Due Date. We may elect to set your APRs for Purchases, Balance Transfers, Direct Deposit and Check Cash Advances, and Bank Cash Advances to different Penalty APRs. We will provide you with a minimum of 45 days advance notice. An increased Penalty APR will remain in effect indefinitely.

Penalty APRs are variable rates calculated using the variable rate formula with a margin of up to 26.74 percentage points; this currently results in an APR of 29.99% (0.082164% DPR). The calculated Penalty APR using this variable rate formula will not exceed 29.99%.

## HOW TO CALCULATE VARIABLE RATES

Variable Rates are calculated by adding together an index and a margin. The applicable margins are disclosed above in the section titled, *Interest Rates - Annual Percentage Rates (APRs)*. This Index is the highest U.S. Prime Rate as published in the "Money Rates" section of *The Wall Street Journal* on the last publication day of each month. As of August 31, 2015, the index used to calculate these variable rates was 3.25%.

An increase or decrease in the index will cause a corresponding increase or decrease in your variable rates on the first day of your billing cycle that begins in the same month in which the index is published. An increase in the index means that you will pay higher interest charges and have a higher Total Minimum Payment Due. If *The Wall Street Journal* does not publish the U.S. Prime Rate, or if it changes the definition of the U.S. Prime Rate, we may, in our sole discretion, substitute another index.

## CALCULATION AND BILLING OF INTEREST CHARGES

We calculate interest by multiplying each Balance Subject to Interest Rate by its applicable DPR and that result is multiplied by the number of days in the billing cycle. Interest is calculated and posted to the applicable

7

Purchase, Balance Transfer or Cash Advance balance on the last day of the billing cycle after all other transactions have posted and payments have been allocated.

## BILLING CYCLE

A billing cycle is a time period that ends on a Statement Closing Date (or Closing Date) determined by us and begins on the day after the Closing Date of the previous billing cycle. Each monthly statement reflects a single billing cycle.

## PAYING INTEREST

When applicable, interest accrues daily and compounds daily on new transactions, and balances remaining from previous billing cycles. Interest will continue to accrue even though you have paid the full amount of any related balances because we include any accrued but unpaid interest in the calculation of each Balance Subject to Interest Rate.

We will not charge you any interest on Purchases if you always pay your entire New Balance Total by the Payment Due Date. Specifically, you will not pay interest for an entire billing cycle on Purchases if you Paid in Full the two previous New Balance Totals on your account by their respective Payment Due Dates; otherwise, each Purchase begins to accrue interest on its transaction date or the first day of the billing cycle, whichever date is later.

We will begin accruing interest on Balance Transfers and Cash Advances on the transaction date. The transaction date for access checks is the date the check is first deposited or cashed.

New Balance Total means the total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement.

Pay in Full or Paid in Full means payments and credits in a billing cycle totaling at least your previous billing cycle's New Balance Total.

Your Payment Due Date will be at least 25 days from your statement Closing Date and will fall on the same calendar day each month.

## BALANCES SUBJECT TO INTEREST RATE

**Average Daily Balance Method (including new Purchases):** We calculate separate Balances Subject to an Interest Rate for Purchases and for each Introductory or Promotional Offer balance consisting of Purchases by: (1) calculating a daily balance for each day in the current billing cycle; (2) adding all the daily balances together; and (3) dividing the sum of the daily balances by the number of days in the current billing cycle. To calculate the daily balance for each day in the current billing cycle, we: (1) take the beginning balance; (2) add an amount equal to the applicable DPR multiplied by the previous day's daily balance; (3) add new Purchases, new Account Fees, and new Transaction Fees; and (4) subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero.

**Average Balance Method (including new Balance Transfers and new Cash Advances):** We calculate separate Balances Subject to an Interest Rate for Balance Transfers, Cash Advances, and for each Introductory or Promotional Offer balance consisting of Balance Transfers or Cash Advances by: (1) calculating a daily balance for each day in the current billing cycle; (2) calculating a daily balance for each day prior to the current billing cycle that had a Pre-Cycle balance -a Pre-Cycle balance is a Balance Transfer or a Cash Advance with a transaction date prior to the current billing cycle but with a posting date within the current billing cycle; (3) adding all the daily balances together; and (4) dividing the sum of the daily balances by the number of days in the current billing cycle.

To calculate the daily balance for each day in the current billing cycle, we: (1) take the beginning balance; (2) add an amount equal to the applicable DPR multiplied by the previous day's daily balance; (3) add new Balance Transfers, Cash Advances and Transaction Fees; and (4) subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero.

To calculate a daily balance for each day prior to the current billing cycle that had a Pre-Cycle balance, we: (1) take the beginning balance attributable solely to a Pre-Cycle balance (which will be zero on the transaction date associated with the first Pre-Cycle balance); (2) add an amount equal to the applicable DPR multiplied by the previous day's daily balance; and (3) add only the applicable Pre-Cycle balances, and their related Transaction Fees. We exclude from this calculation all transactions posted in previous billing cycles.

## MINIMUM INTEREST CHARGE

If the total of the interest charges for all balances is less than $1.50, then a Minimum Interest Charge of $1.50 will be assessed on the account. This fee is in lieu of any interest charge.

## TRANSACTION FEES

We will assess the following Transaction Fees to your account in the same category to which the transaction is posted:

If you obtain an ATM Cash Advance, we will assess a transaction fee equal to 5.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you obtain a Balance Transfer, we will assess a transaction fee equal to 3.00% of the U.S. dollar amount of each such Balance Transfer (Fee: Min. $10.00).

If you obtain a Cash Equivalent, we will assess a transaction fee equal to 5.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you obtain a Check Cash Advance, we will assess a transaction fee equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you obtain a Direct Deposit, we will assess a transaction fee equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you make a Foreign Transaction, we will assess a transaction fee equal to 3.00% of the U.S. dollar amount of each such Foreign Transaction. This is in addition to any other applicable transaction fees. Foreign Transaction means any transaction made in a foreign currency, and any transaction made in U.S. dollars if the transaction is made or processed outside of the United States. Foreign Transactions include for example, online purchases from foreign merchants.

If you obtain an Overdraft Protection Cash Advance, we will assess a transaction fee of $10.00 for each such Cash Advance.

If you obtain an Over the Counter Cash Advance, we will assess a transaction fee equal to 5.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you obtain a Same-Day Online Cash Advance, we will assess a transaction fee equal to 5.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you make a Wire Transfer Purchase, we will assess a transaction fee equal to 5.00% of the U.S. dollar amount of each such Purchase (Fee: Min. $10.00).

## ACCOUNT FEES

The following fees are assessed as "Purchases" in the billing cycle in which the fees accrue:

A Late Fee of $25.00 if the Total Minimum Payment Due shown on your monthly statement is not received by us on or before its Payment Due Date. If a late fee was assessed any time in the prior six billing cycles, then the amount of the late fee will be $35.00. The Late Fee will not exceed the Total Minimum Payment Due immediately prior to assessment of the fee. If your balance is $100 or less on the Payment Due Date, we will not assess a Late Fee.

A Returned Payment Fee of $25.00 if a payment on your account is returned for insufficient funds or for any other reason, even if it is paid upon subsequent presentment (if we elect to re-present the payment). The Returned Payment Fee will not exceed the Total Minimum Payment Due immediately prior to assessment of the fee, and will never exceed the amount of the payment being returned.

# PAYMENTS AND DEFAULT

## YOUR PROMISE TO PAY

You promise to pay us the amounts of all credit you obtain, which includes all Purchases, Balance Transfers, and Cash Advances. You also promise to pay us all the amounts of interest charges, fees, and any other transactions charged to your account. If a bank branch or office sponsors your account, you promise to pay it any unpaid account balance it pays us within 30 days.

## PAYMENTS ON YOUR ACCOUNT

You must pay each month at least the Total Minimum Payment Due shown on your monthly statement by its Payment Due Date. Payments must conform to the requirements set out on that monthly statement; these requirements may vary without prior notice. You may pay the entire amount you owe us at any time. Payments made in any billing cycle that are greater than the Total Minimum Payment Due will not affect your obligation to make the next Total Minimum Payment Due. If you overpay or if there is a credit balance on your account, we will not pay interest on such amounts. We will reject payments that are not drawn in U.S. dollars and those drawn on a financial institution located outside of the United States. We reserve the right to reject any payment if your account has a credit balance as of the day we receive that payment. Generally, credits to your account, such as those generated by merchants or by person-to-person money transfers, are not treated as payments and will not reduce your Total Minimum Payment Due.

## ACH PAYMENTS

We process most payment checks electronically. We use the information on your check to create an electronic funds transfer. Each time you send a check, you authorize a one-time electronic funds transfer. You also authorize us to process your check as a check or paper draft, as necessary. Funds may be withdrawn from your account as soon as the same day we receive your payment. You will not receive your cancelled check because

9.

we are required to destroy it. We will retain an electronic copy. For more information or to stop the conversion of your checks into electronic funds transfers, call us at the phone number listed on the front of your monthly statement. You may also write to us at: P.O. Box 982234, El Paso, TX 79998-2234.

## TOTAL MINIMUM PAYMENT DUE

You may pay your total outstanding balance at any time. Each billing cycle, you must pay at least the Total Minimum Payment Due shown on your monthly statement by its Payment Due Date. The Total Minimum Payment Due is the sum of all past due amounts plus the Current Payment.

The Current Payment for each billing cycle includes three amounts: (1) 1.00% of your balance (your New Balance Total except for any new interest charges and any new Late Fee), and (2) new interest charges, and (3) any new Late Fee. Your Current Payment will not be less than $25.00. We round the payment amount down to the nearest dollar.

The Total Minimum Payment Due will not be greater than your New Balance Total. If a payment is credited to your account but is returned unpaid in a later billing cycle, we will recalculate the Total Minimum Payment Due for the billing cycle in which the payment was originally credited.

## WHEN YOUR PAYMENT WILL BE CREDITED TO YOUR ACCOUNT

We credit payments as of the date received, if the payment is: (1) received by 5 p.m. local time at the address shown on the remittance slip on the front of your monthly statement; (2) paid with a check drawn in U.S. dollars on a U.S. financial institution or a U.S. dollar money order; and (3) sent in the return envelope with only the bottom portion of your statement accompanying it. Payments received after 5 p.m. local time at the remittance address on any day including the Payment Due Date, but that otherwise meet the above requirements, will be credited as of the next day. Credit for any other payments may be delayed up to five days.

## HOW WE ALLOCATE YOUR PAYMENTS

Payments are allocated to posted balances. If your account has balances with different APRs, we will allocate the amount of your payment equal to the Total Minimum Payment Due to the lowest APR balances first. Payment amounts in excess of your Total Minimum Payment Due will be applied to balances with higher APRs before balances with lower APRs.

## PROMISE TO PAY APPLIES TO ALL PERSONS

All persons who initially or subsequently request, are granted, accept, guarantee or use the account are individually and together responsible for any total outstanding balance. If you are responsible to pay any total outstanding balance, we may refuse to release you from liability until all of the cards, access checks, and other credit devices outstanding under the account have been returned to us and you repay us the total outstanding balance owed to us under the terms of this Agreement.

## DEFAULT

You will be in default of this Agreement if: (1) you fail to make any required Total Minimum Payment Due by its Payment Due Date; (2) your total outstanding balance exceeds your Total Credit Line; (3) your Bank Cash Advance balance exceeds your Cash Credit Line; or (4) you fail to abide by any other term of this Agreement. Solely for the purposes of determining eligibility and premium payment obligations for the optional credit insurance purchased through Bank of America, you will be deemed in default or delinquent if you fail to make a payment within 90 days of your Payment Due Date.

## WHEN WE MAY REQUIRE IMMEDIATE REPAYMENT

If you are in default, then in addition to our other remedies under this Agreement, we can require immediate payment of your total outstanding balance and, unless prohibited by applicable law, we can also require you to pay the costs we incur in any collection proceeding, as well as reasonable attorneys' fees if we refer your account for collection to an attorney who is not our salaried employee.

## OTHER PAYMENT TERMS

We can accept late payments, partial payments, or payments with any restrictive writing without losing any of our rights under this Agreement. This means that no payment, including those marked with paid in full or with any other restrictive words, shall operate as an accord and satisfaction without the prior written approval of one of our senior officers. You may not use a postdated check to make a payment. If you do postdate a payment check, we may elect to honor it upon presentment or return it uncredited to the person that presented it, without in either case waiting for the date shown on the check. We are not liable to you for any loss or expense arising out of the action we elect to take.

10

**MODIFICATIONS TO REQUIRED MINIMUM MONTHLY PAYMENTS**

We may allow you, from time to time, to omit a monthly payment or make a reduced payment. We will notify you when these options are available. This will only occur on an isolated basis, such as when the bank is working with borrowers affected by a federally declared disaster. If in response to this notification, you omit a payment or make a reduced payment, interest charges, applicable fees, and other regular transactions, if any, will accrue on your account balances in accordance with this Agreement. The reduced payment amount may be less than your interest charges. You must make the reduced payment on time to avoid a Late Fee. You must resume making your regular Total Minimum Payment Due each month following any modifications made to your required minimum monthly payment.

# CREDIT AVAILABILITY

**YOUR CREDIT LINES**

Your Total Credit Line and Cash Credit Line are disclosed to you when you receive your card and, generally, on each monthly statement. The Total Credit Line is the amount of credit available for the account; however, only a portion of that is available for Bank Cash Advances. The Cash Credit Line is that amount you have available for Bank Cash Advances. The amount of credit available in your Cash Credit Line will never exceed the amount of credit available in your Total Credit Line.

We may change your credit lines from time to time. We base that decision on a variety of factors such as your payment and transaction history with us, and information we receive from third parties, including credit reporting agencies. The amounts shown on your monthly statement as available credit do not take into account Purchases, Balance Transfers, Cash Advances, interest charges, fees, any other transactions, or credits which post to your account after the Closing Date of that monthly statement.

**WHAT WE MAY DO IF YOU ATTEMPT TO EXCEED YOUR CREDIT LINES**

The total outstanding balance on your account plus authorizations at any time must not be more than your Total Credit Line. The total outstanding balance of your Bank Cash Advances (plus authorizations) must not be more than your Cash Credit Line.

Each time you attempt a transaction which results in your applicable outstanding balance (plus authorizations) exceeding a credit line, we may: (1) permit the transaction without raising your credit line; (2) permit the transaction and treat the amount of the transaction that is more than the credit line as immediately due; or (3) refuse to permit the transaction.

If we refuse to permit the transaction, we may advise the person who attempted the transaction that it has been refused. If we refuse to permit a Check Cash Advance or Balance Transfer, we may do so by advising the person presenting the Check Cash Advance or Balance Transfer that credit has been refused, that there are insufficient funds to pay the Check Cash Advance or Balance Transfer, or in any other manner.

**WE MAY SUSPEND OR CLOSE YOUR ACCOUNT**

We may suspend or close your account or otherwise terminate your right to use your account. We may do this at any time and for any reason. We may elect to not honor any access check which is written after the expiration date printed on that check. You may close your account at anytime by notifying us in writing or by telephone. Your obligations under this Agreement continue even after the account is closed. You must destroy all cards, access checks or other credit devices on the account when the account is closed.

When your account is closed, you must contact anyone authorized to charge transactions to your account, such as internet service providers, health clubs or insurance companies. These transactions may continue to be charged to your account until you change the billing. Also, if we believe you have authorized a transaction or are attempting to use your account after you have requested to close the account, we may allow the transaction to be charged to your account.

**REFUSAL TO HONOR YOUR ACCOUNT**

We may deny any transactions for any reason at our discretion. We are not liable for any refusal to honor your account. This can include a refusal to honor your card or account number or any check written on your account. We are not liable for any retention of your card by us, any other financial institution, or any provider of goods or services.

**RECURRING PREAUTHORIZED TRANSACTIONS**

Recurring preauthorized transactions occur when you authorize a merchant to automatically initiate a transaction using your account on a recurring basis. If we issue a new credit card with a different number or

11

expiration date to you, we may (but are not obligated to) provide your new card number and expiration date to a merchant with whom you have set up a recurring preauthorized transaction in order to continue your recurring preauthorized transactions. There will be circumstances where you will have to contact the merchant.

# LIMITATIONS/WARNINGS

### PURPOSES FOR USING YOUR ACCOUNT
You may not use this account to make a payment on this or any other credit account with us or our affiliates. You may not use or permit your account to be used to make any illegal transaction. You will only use your account for transactions that are legal where you conduct them. For example, Internet gambling transactions may be illegal in your state. Display of a payment card logo by an online merchant does not mean that an Internet transaction is legal where you conduct it. We may charge your account for such transactions. We will not be liable if you engage in an illegal transaction. We may deny authorization of any transactions identified as Internet gambling. You may not use your account to conduct transactions in any country or territory, or with any individual or entity that is subject to economic sanctions administered and enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC). Use of your account in those countries will be blocked.

### PERSONS USING YOUR ACCOUNT
If you permit any person to use your card, access checks, account number, or other credit device with the authorization to obtain credit on your account, you will be liable for all transactions made by that person including transactions for which you may not have intended to be liable, even if the amount of those transactions causes a credit line to be exceeded. Authorized users of this account may have the same access to information about the account and its users as the account holders. We may send account materials (cards, statements and notices) to any liable party, and that person will be responsible for delivering those materials to the other liable parties and authorized users. Notice to any of you will be considered notice to all of you. You may allow authorized users on your account in the following ways: (1) by notifying us that you want someone added to your account as an authorized user; (2) by lending or otherwise intentionally making your card, account number, or credit device accessible to another; or (3) by any other ways in which you would be legally considered to have allowed another to use your account or to be legally prevented from denying that you did so. You must think carefully before you allow anyone to become an authorized user. By doing so, you authorize the person to use your account to the same extent you can, including but not limited to making any Purchases, Balance Transfers, Cash Advances, and allowing others to use your account. Your account does not permit you to limit the nature or amount of authority you give to any authorized user and you will not attempt to do so. An authorized user's authority will continue until you both notify us that you are terminating the authority and you physically retrieve the card or other credit device.

### HOW YOU MAY STOP PAYMENT ON AN ACCESS CHECK
You may request a stop payment on an access check by providing us with the access check number, dollar amount, and payee exactly as they appear on the access check. Oral and written stop payment requests on an access check are effective for six months from the day that we place the stop payment.

### YOU MAY NOT POSTDATE AN ACCESS CHECK
You may not issue a postdated access check on your account. If you do postdate an access check, we may elect to honor it upon presentment or return it unpaid to the person that presented it to us for payment, without in either case waiting for the date shown on the access check. We are not liable to you for any loss or expense arising out of the action we elect to take.

# MISCELLANEOUS

### OVERDRAFT PROTECTION
If your checking account with Bank of America is linked to this account, this overdraft protection feature will allow funds to be transferred (overdraft protection transfers) from this account into your designated checking account with Bank of America (checking account) when transactions occur on your checking account, such as checks or other debits, that if paid would cause the checking account to be overdrawn (overdraft transactions). Overdraft protection transfers include automatic transfers to cover checking account fees. Overdraft protection transfers are processed after close of business Monday through Friday and are treated as Overdraft Protection Cash Advances. Each day's overdraft transactions will be totaled and rounded to the next $100 increment up to your available Cash Credit Line, regardless of who initiated the overdraft transactions. For example,

12

if your checking account has a balance of $1.00 and a check or other debit item for $125 is presented for payment, which if paid would cause your checking account to be overdrawn, an overdraft protection transfer of $200 will be made to your checking account and an Overdraft Protection Cash Advance of $200 will post to this account. The Portion of Credit Available for Cash on this account must be sufficient to cover the total amount of overdraft transactions (received by Bank of America that day) rounded to the next $100 increment (but excluding any overdraft protection fee); otherwise one or more of the overdraft transactions for that day will be rejected. However, if the Portion of Credit Available for Cash on this account is greater than the overdraft transaction amount, but the Portion of Credit Available for Cash is insufficient for the overdraft transaction amount to be rounded to the next $100 increment, then the amount of the overdraft transaction will be the amount of your Portion of Credit Available for Cash. We will not assess an Overdraft Protection Cash Advance fee for any overdraft protection transfer from this account to a linked Bank of America checking account, if we determine that your account is overdrawn by a total amount less than $12.00, after we finish processing for the day. If your account is subject to an Overdraft Protection Cash Advance fee, then overdraft protection transfers will be assessed the Overdraft Protection Cash Advance fee for each such Cash Advance. We may permit or refuse to permit any overdraft protection transfer that would cause you to exceed the Cash Credit Line on this account. This overdraft protection feature will automatically be cancelled if this account is closed by either you or us, or at any time upon your request. Your overdraft transactions remain subject to the terms of your checking account with Bank of America, any related enrollment agreement, and this Agreement.

## WE MAY MONITOR AND RECORD TELEPHONE CALLS

You consent to and authorize Bank of America, any of its affiliates, or its marketing associates to monitor and/or record any of your telephone conversations with our representatives or the representatives of any of those companies. Where you have provided a cell phone number directly to us, or placed a cell phone call to us, you consent and agree to accept collection calls to your cell phone from us. For any telephone or cell phone calls we place to you, you consent and agree that those calls may be automatically dialed and/or use recorded messages.

## CREDIT REPORTING AGENCIES; COLLECTING AND SHARING INFORMATION

You authorize us to collect information about you in order to conduct our business and deliver the top quality service you expect, including information we receive about you, information we receive from third parties such as credit reporting agencies and information about your transactions with us and other companies. You authorize us to share such information about you or your account with our affiliates and others. You may have the right to opt out of some information sharing. For more details, please refer to our Privacy Notice.

If you believe we have furnished inaccurate or incomplete information about you or your account with respect to a credit reporting agency, write to us at: Bank of America, N.A., Credit Reporting Agencies, P.O. Box 982238, El Paso, TX 79998-2238. Please include your name, address, home phone number, and account number, and explain what you believe is inaccurate or incomplete.

## BENEFITS

We may offer you certain benefits and services with your account. Any benefits or services are not a part of this Agreement, but are subject to the terms and restrictions outlined in the Benefits Guide and other official documents provided to you from time to time by or on behalf of Bank of America. We may adjust, add, or delete benefits and services at any time and without notice to you.

## WE MAY SELL YOUR ACCOUNT

We may at any time, and without notice to you, sell, assign or transfer your account, any amounts due on your account, this Agreement, or our rights or obligations under your account or this Agreement to any person or entity. The person or entity to whom we make any such sale, assignment or transfer, shall be entitled to all of our rights and shall assume our obligations under this Agreement, to the extent sold, assigned or transferred.

## YOU MUST NOTIFY US WHEN YOU CHANGE YOUR ADDRESS

You must notify us promptly when you change your address. We may also change your address if so notified by the post office or others.

## WHAT LAW APPLIES

This Agreement is made in North Carolina and we extend credit to you from North Carolina. This Agreement is governed by the laws of the State of North Carolina (without regard to its conflict of laws principles) and by any applicable federal laws.

13

**PROVISIONS OF THIS AGREEMENT ARE SEVERABLE**

If any provision of this Agreement is found to be invalid, the remaining provisions will continue to be effective. We use section headings (e.g., *Types of Transactions*) to organize this Agreement. The headings are for reference purposes only.

**UNAUTHORIZED USE OF YOUR ACCOUNT**

Please notify us immediately of the loss, theft, or possible unauthorized use of your account at 1.866.282.4205.

# YOUR BILLING RIGHTS

**Keep this Document for Future Use**

**This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.**

**What To Do If You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us at:

Bank of America

P.O. Box 982234

El Paso, TX 79998-2234

In your letter, give us the following information:

- Account information: Your name and account number.
- Dollar amount: The dollar amount of the suspected error.
- Description of problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

Note: It is very helpful if your letter includes the transaction date and the reference number for the charge, if available.

**What Will Happen After We Receive Your Letter**

When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

While we investigate whether or not there has been an error:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your Total Credit Line.

After we finish our investigation, one of two things will happen:

- If we determine there was a mistake: You will not have to pay the amount in question or any interest or other fees related to that amount.
- If we do not believe there was a mistake: You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent, including to credit reporting agencies, if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within 10 days telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

**Your Rights if You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

14

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)

2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.

3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at:
Bank of America
P.O. Box 982234
El Paso, TX 79998-2234

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

©2015 Bank of America Corporation. All rights reserved.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

MYUNG JIN MYRA KOZLOWSKI,        Plaintiff,

**CERTIFICATE OF
SERVICE FOR
SERVICE BY MAIL**

vs.

Case No. 1:18-CV-00131-
DAD-EPG

BANK OF AMERICA, N.A., et al.,

Defendant(s).

I hereby certify that on _07/09/2018_ (mm/ dd/ yyyy), I caused the following documents:

PLAINTIFF'S SECOND AMENDED COMPLAINT

[Check the box, below, that applies to how you served the above documents.]

☐ to be filed electronically with the Clerk of Court through ECF and/ or

☑ that I caused a copy of the foregoing documents (and the notice of electronic filing, if filed electronically) to be mailed by first class mail, postage paid, to the following:

McGuireWoods, LLP
Two Embarcadero Center, Suite 1300
San Francisco, CA 94111
For: BANK OF AMERICA, N.A.

Nokes & Quinn
410 Broadway, Suite 200
Laguna Beach, CA 92651
For: EQUIFAX, INC

Nokes & Quinn
410 Broadway, Suite 200
Laguna Beach, CA 92651
For: EQUIFAX INFORMATION SERVICES, LLC

Donna Woo
3161 Michaelson Drive, Suite 800
Irvine, CA 92612
For: EXPERIAN INFORMATION SOLUTIONS, INC.

Jacobsen & McElroy
2401 American River Dr, Suite 100
Sacramento, CA 95825
For: TRANSUNION, LLC

THE MOORE LAW GROUP, APC
3710 S. SUSAN STREET, SUITE 210
SANTA ANA, CALIFORNIA 92704
For: THE MOORE LAW GROUP, APC

THE MOORE LAW GROUP, APC
3710 S. SUSAN STREET, SUITE 210
SANTA ANA, CALIFORNIA 92704
For: HARVEY M. MOORE

Date: July 9, 2013

s/

Signature of filing party

Myung Jn Myra Kozlowski
Filer's Typed Name